PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

OVERNITE TRANSPORTATION COMPANY,
*Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent,*

and

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

*Intervenor.*

No. 01-1388

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

OVERNITE TRANSPORTATION COMPANY,
*Respondent.*

No. 01-1498

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board.
(18-CA-15496)

Argued: January 25, 2002

Decided: July 1, 2002

Before NIEMEYER, LUTTIG, and KING, Circuit Judges.

Enforced by published opinion. Judge Luttig wrote the opinion, in which Judge Niemeyer and Judge King joined.

**COUNSEL**

**ARGUED:** Christopher A. Johlie, MATKOV, SALZMAN, MADOFF & GUNN, Chicago, Illinois, for Overnite. William M. Bernstein, Senior Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Marc Allen Stefan, BUTSAVAGE & ASSOCIATES, P.C., Washington, D.C., for Intervenor. **ON BRIEF:** Kenneth T. Lopatka, Kenneth F. Sparks, Brian V. Alcala, MATKOV, SALZMAN, MADOFF & GUNN, Chicago, Illinois, for Overnite. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Carey R. Butsavage, BUTSAVAGE & ASSOCIATES, P.C., Washington, D.C., for Intervenor.

**OPINION**

LUTTIG, Circuit Judge:

Overnite Transportation Company is a trucking company that operates approximately 176 terminals in North America. Some local unions affiliated with the International Brotherhood of Teamsters filed petitions with the National Labor Relations Board seeking to represent employees at four of these terminals — in Lexington, Kentucky; Buffalo, New York; Detroit, Michigan; and Bowling Green, Kentucky. Elections were held; the Board found that the IBT locals won at all four terminals and certified the locals as exclusive bargaining agents. After Overnite refused to bargain with the locals, the Board ordered it to do so. J.A. 1722-28. Overnite petitions for review of the Board's order. For the reasons that follow, we deny Overnite's petition for review and enforce the Board's order.

## I.

Overnite first challenges the Board's bargaining unit determinations at the Lexington and Buffalo terminals. In Lexington, IBT Local 651 petitioned to represent two separate employee units: a "drivers/dockworkers" unit, which included approximately 243 road drivers, city drivers, jockeys, and linehaul workers, and a "mechanics" unit, comprising 53 mechanics and other shop employees. Although Overnite argued for a single bargaining unit at Lexington comprised of all its employees at the depot, the Board's Regional Director held that the separate units sought by Local 651 were appropriate. J.A. 549-57.[1] In Buffalo, IBT Local 375 petitioned to represent only the 32 drivers and dockworkers who worked at that terminal. Again, Overnite sought to include the three mechanics who worked at the Buffalo terminal in the bargaining unit, but to no avail. Although the Regional Director agreed with Overnite that the mechanics should be included in the bargaining unit, the Board reversed, holding that the mechanics need not be included.[2] J.A. 882-85; 1016-19.

Section 9(b) of the National Labor Relations Act authorizes the Board to decide "the unit appropriate for the purposes of collective bargaining," 29 U.S.C. § 159(b), and the Board enjoys broad discretion in determining the appropriate bargaining unit. *See Arcadian Shores, Inc.* v. *NLRB*, 580 F.2d 118, 119 (4th Cir. 1978). Section 9(c)(5) of the Act, however, imposes a statutory constraint on the Board's discretion:

> In determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling.

The "extent of organization" refers generally to "the groups of employees on which the union has focused its organizing efforts." *See*

---

[1] The union won the election among the Lexington drivers/dockworkers unit by a vote of 127 to 123, and lost the election in the separate Lexington mechanics unit by a 42 to 9 vote.

[2] The union won the election in the mechanics-excluded Buffalo unit by a vote of 16 to 14.

*NLRB* v. *Lundy Packing Co.*, 68 F.3d 1577, 1580 (4th Cir. 1995) (citing 1 *The Developing Labor Law* at 452).

Overnite contends that the Board violated section 9(c)(5) by excluding the mechanics from the units sought by the Teamsters in Lexington and Buffalo. As evidence of this statutory violation, Overnite relies on the Board's decision to *include* mechanics in a single bargaining unit at its Memphis terminal when the Teamsters requested a mechanics-included unit there.[3] Claiming that the Memphis terminal is "factually indistinguishable" from the Lexington terminal, Overnite argues that the Board's exclusion of mechanics from the Lexington drivers/dockworkers unit and the Buffalo unit was "controlled" by the Teamsters' desire to focus its organizing efforts on mechanics-excluded units at those terminals.

A.

We first address, but do not resolve, the parties' differing constructions of section 9(c)(5). The Board, correctly noting that there may be more than one "appropriate" bargaining unit under section 9(b), and that the Board is "free to select any one of these appropriate units as the bargaining unit," *Arcadian Shores*, 580 F.2d at 119, believes that section 9(c)(5) applies only to Board determinations that a proposed bargaining unit is *an* appropriate unit — in other words, a *candidate* for selection as the unit in which the election will be held. Section 9(c)(5) imposes no constraint, in the Board's view, on its ability to choose which of the "appropriate" units will be *the* unit selected for the purposes of collective bargaining. *Accord Country Ford Trucks, Inc.* v. *NLRB*, 229 F.3d 1184, 1191 (D.C. Cir. 2000) ("[T]he NLRB may simply look at the Union's proposed unit and, if it is an appropriate unit, accept that unit determination without any further inquiry."). On this reading, the plain language of section 9(c)(5) addresses only the question of whether a unit is appropriate; it does not regulate the Board's ultimate selection between competing appropriate units.

Overnite interprets section 9(c)(5) to prohibit the Board's actual selection of a bargaining unit from being "controlled" by the extent

---

[3]The union lost the election in the mechanics-included Memphis unit.

of organization. The Board crossed that line, according to Overnite, by adopting a policy of selecting whatever bargaining unit the union requests, so long as that petitioned-for unit is "appropriate" under the "community of interests" test. *See* J.A. 1016. Overnite further contends that our precedents foreclose the Board's construction of section 9(c)(5), in particular statements found in *Singer Sewing Machine Co. v. NLRB*, 329 F.2d 200, 205 (4th Cir. 1964) ("[I]f the evidence establishes that the extent of union organization was the controlling factor in the selection of the Pittsburgh City District as *the* appropriate unit, the resulting order finding the refusal to bargain to be an unfair labor practice is invalid.") (emphasis added), and *Arcadian Shores*, 580 F.2d at 120 ("[T]he burden rests with [a party seeking to establish a section 9(c)(5) violation] to establish that the extent of union organization was the dominant factor in the Board's determination of *the* bargaining unit.") (emphasis added).

## B.

We leave this issue for another day,[4] because we conclude that even under Overnite's construction of section 9(c)(5), which we will assume applies but do not adopt, Overnite has not presented sufficient evidence to show that the extent of organization was "controlling" in the Board's selection of mechanics-excluded bargaining units in Lexington and Buffalo. Nowhere does the NLRA define "controlling" for purposes of section 9(c)(5), but several possibilities present themselves. The broadest interpretation of "controlling" would prohibit the Board from even considering extent of organization as a factor in its

---

[4]The competing readings of section 9(c)(5) present a particularly knotty question of statutory construction, as what seems to be the plain language of the statute is difficult to reconcile with statements found in our precedents. We note, however, that none of these decisions cited by Overnite, which include *NLRB* v. *Lundy Packing Co.*, 68 F.3d 1577 (4th Cir. 1995), *NLRB* v. *Glen Raven Knitting Mills*, 234 F.2d 413 (4th Cir. 1956), and *Singer Sewing Machine Co.* v. *NLRB*, 329 F.2d 200 (4th Cir. 1964), actually analyzed this statutory interpretation issue in section 9(c)(5), nor did they consider and reject the Board's proffered construction of the statute before us. When confronted with potentially inconsistent, yet binding, authority, the best course of action is to decide the case on other grounds, if at all possible.

unit determination decisions. The Supreme Court rejected this construction out of hand in *NLRB* v. *Metropolitan Life Insurance Co.*, 380 U.S. 438, 442 (1965) ("Section 9(c)(5) [does not] prohibit the Board from considering the extent of organization as one factor, though not the controlling factor, in its unit determination."). *See also General Instrument Corp.* v. *NLRB*, 319 F.2d 420 (4th Cir. 1963) ("[A]lthough the extent of organization may not be controlling, it may be a factor."). The stingiest reading of the statutory prohibition would only prevent unit determinations in which extent of organization was the sole factor used in the decision. Our court has steered a middle path between these extremes, holding that section 9(c)(5) allows the Board to consider the extent of organization as one factor in its unit determination decisions, but prohibits the extent of union organization from being "the *dominant* factor in the Board's determination of the bargaining unit." *Lundy Packing Co.*, 68 F.3d at 1580 (quoting *Arcadian Shores*, 580 F.2d at 120 (emphasis added)).

The Board chose a mechanics-included unit at Overnite's Memphis terminal and mechanics-excluded units at the Lexington and Buffalo terminals. Insisting that the labor situation at its Memphis terminal is "factually indistinguishable" from its Lexington terminal (but not its Buffalo terminal), Overnite claims the Board simply "gave the union any unit it want[ed]." But this, by itself, does not necessarily prove that extent of organization was "controlling" in the Board's unit determination. Simply because that factor may have been *determinative* in the selection of the Memphis and Lexington bargaining units does not make it *controlling* under section 9(c)(5); any permissible factor may tip the balance in a close case. *See Texas Pipe Line Co.* v. *NLRB*, 296 F.2d 208, 213 (5th Cir. 1961) ("By definition such a factor, in a close case, may be determinative; otherwise the factor is deprived of all significance.").

Instead, Overnite's burden, under its construction of section 9(c)(5), is to show that the extent of organization was the *dominant* factor in the Board's unit determinations. *See Lundy Packing Co.*, 68 F.3d at 1580; *Arcadian Shores*, 580 F.2d at 120. A comparison of the Regional Directors' decisions in the Memphis and Lexington unit determinations reveals this not to be the case. In the Memphis unit determination, the Regional Director relied on community of interest factors, as well as caselaw supporting the inclusion of mechanics and

drivers in the same bargaining unit, in finding that the mechanics were an "essential link" in Overnite's operations. Appellant's Br. at Add. 24. In the Lexington decision, the Regional Director did explicitly acknowledge that "a [union's] desires concerning the composition of the unit(s) which it seeks to represent constitute a relevant consideration," J.A. 553, but also buttressed its decision with caselaw finding separate bargaining units to be appropriate under circumstances similar to those at Lexington. J.A. 553. The reasons given by the Regional Directors in the Memphis and Lexington unit determinations reveal that extent of organization was, at most, *a* factor considered in the unit determinations; it was not the dominant factor.[5]

In addition, Overnite's claim that the Memphis and Lexington facilities are "factually indistinguishable" lacks credibility given the characterizations it made before the Board's Regional Director in the Memphis case. To give just two examples, in the Memphis case Overnite argued to the Regional Director that the mechanics' "contact with the other employees is minimal." Appellant's Br. at Add. 24. Now, Overnite would have us believe that at all its terminals, including Lexington, Buffalo, and Memphis, "[m]echanics frequently interact with employees working in other classifications. For example, road drivers must bring their tractors into the shop for inspection upon arrival at the terminal . . . . Likewise, city drivers frequently interact with mechanics when they call the shop for assistance with their units . . . ." Appellant's Br. at 15-16. Also in the Memphis case, Overnite claimed that the mechanics "are paid more than the other employees." Appellant's Br. at Add. 24. Now, Overnite says the mechanics at all Overnite terminals "are part of the same pay structure as drivers, dockworkers, jockeys, and other terminal employees" and "operate under the same wage progression program as the other employees." Appellant's Br. at 14-15. It is difficult for an appellate court to accuse the Regional Directors of unprincipled decisionmaking based on representations that are completely contrary to what one of the Regional Directors heard below. But, again, even if we were to assume that the Memphis and Lexington facilities were completely identical, Overnite

---

[5]*See NLRB* v. *Southern Metal Service, Inc.*, 606 F.2d 512, 514 (5th Cir. 1979) ("Explicit recognition of [a union's] desire as a factor in the balancing process does not make it "controlling" within the prohibition of the statute.").

has merely demonstrated that extent of organization was *a* factor in its unit determination, which *Metropolitan Life Insurance* allows.

More troubling, perhaps, is the Board's statement, in its decision denying Overnite's motion for reconsideration of its unit determination at the Buffalo terminal, that "[t]he Board's declared policy is to consider *only* whether the unit requested [by the union] is an appropriate one, even though it may not be the most optimum or most appropriate unit for collective bargaining." J.A. 1016 (emphasis added). This could mean that the Board considered only two factors in the Buffalo unit determination: 1) extent of organization, and 2) whether the proposed unit is an appropriate one under the "community of interests" test. As Overnite puts it, the union gets the unit it wants so long as that unit is appropriate. While Overnite suggests that this standard is a *per se* violation of section 9(c)(5) (adopting, *arguendo*, Overnite's construction of that statute), we disagree. The Board's announced standard *may* lead to some decisions where the extent of organization will be the dominant factor in unit selection (such as in cases where the community of interest considerations in support of the union's proposed unit are weak), but not all cases will be like that. And that did not happen here, where the Board supported its decision to exclude the mechanics from the Buffalo unit with numerous community of interest factors. J.A. 882.[6] While we are sensitive to Overnite's concern that the Board could circumvent Overnite's construction of section 9(c)(5) by reciting "community of interest" factors as window dressing to mask what is in reality the dominance of union organizational concerns, the mere fact that the Board found a mechanics-included unit at Overnite's Memphis terminal does not convince us that the community of interest factors given by the Board in this case for excluding the mechanics at Buffalo or Lexington were pretextual.

Thus, even under Overnite's construction of section 9(c)(5), which we do not adopt but rather assume *arguendo* applies, we find no statu-

---

[6]The Board relied, among other things, on the lack of regular interchange between the mechanics and other employees in the unit, the mechanics' specialized skill and training, the distinct shifts worked by the mechanics, and the lack of common supervision over the mechanics and the other employees at the Buffalo terminal. J.A. 882.

tory violation in the Board's unit determinations at Lexington or Buffalo.

## II.

We next turn to Overnite's contention that the Board improperly excluded the ballots of Wayne McDaniel and Roger Riddell in the Lexington driver/dockworker unit election. Local 651 prevailed in that election by a four-vote margin, not counting the votes contained in seven challenged ballots. The Board sustained the challenges to McDaniel's and Riddell's ballots, but overruled the challenges to three of the seven ballots. The Board, however, did not open and count those three ballots because they could not, in light of the union's four-vote lead, be outcome-determinative.

If Overnite is correct that McDaniel's and Riddell's ballots were improperly excluded, these ballots (combined with the three ballots that the Board held were improperly excluded) could affect the outcome of the election. Accordingly, we address Overnite's claim that the Board should have counted McDaniel's and Riddell's ballots.

The Board refused to count the ballots because it concluded that McDaniel and Riddell were "operations clerks" who were excluded from the Lexington drivers/dockworkers bargaining unit pursuant to an oral stipulation. J.A. 1240. Overnite insists that McDaniel and Riddell are not "operations clerks" and, in any event, claims that the Board misconstrued its stipulation. The now-disputed "stipulation" was made at a hearing on December 15, 1995:

> HEARING OFFICER JACOBSON: All right. In addition there are two OS&D clerks and four operations clerks who the parties agree are office clerical employees who should be excluded from the unit, is that correct?
>
> MR. STEFAN:[7] That's correct.
>
> MR. SALZMAN:[8] Yes.

---

[7]Mr. Stefan represented Local 651 at the hearing.

[8]Mr. Salzman represented Overnite at the hearing.

J.A. 312. The stipulation contains a dangling modifier — "who should be excluded from the unit." Overnite believes it only modifies the six individuals referenced in the stipulation (which do not include McDaniel and Riddell), whereas the Board thinks it modifies not only those six individuals but all office clerical employees. Either reading is permissible, but the Board's decision to exclude the ballots of McDaniel and Riddell does not stand or fall on how we parse the oral stipulation.

At the very least, Overnite agreed with the union that four of the operations clerks should be excluded from the bargaining unit. Once that step was taken, the Board could permissibly keep any other operations clerks out of the bargaining unit in keeping with its "community of interests" standard. Indeed, it would be difficult for a reviewing court to sustain as "appropriate" any bargaining unit that included (or excluded) only a portion of a group of workers with identical job functions. So the Board could permissibly exclude the ballots of other operations clerks, even if we adopted Overnite's narrow interpretation of the stipulation. That means the Board could sustain the challenges to McDaniel's and Riddell's ballots — so long as the Board accurately characterized McDaniel and Riddell as "operations clerks."

And we have no doubt that it did, notwithstanding Overnite's protest that neither McDaniel nor Riddell is classified as an operations clerk. (McDaniel is classified as a dockworker, and Riddell is classified as a dock leadman.) Overnite does not dispute the Board's findings that McDaniel became a full-time operations clerk in 1985, and his reclassification as a dock worker in 1994 was only because of a change in Overnite's classification or wage structure. J.A. 1182. McDaniel's duties did not change after this reclassification and he testified that he has not worked on the dock at all since 1985. *Id.* Nor does Overnite dispute the Board's finding that Riddell works exclusively in the road dispatch office and performs the functions of an operations clerk, notwithstanding his classification as dock leadman. *Id.* By focusing, as the Board did, on the McDaniel's and Riddell's actual job duties rather than their nominal classifications given by Overnite, we are satisfied that the Board properly classified them as operations clerks and properly sustained the challenges to their ballots.

III.

Overnite also seeks to set aside the election results in Lexington, Buffalo, Detroit, and Bowling Green on the grounds that the Locals engaged in unlawful election-day surveillance at these terminals. The results of a Board-supervised representation election are presumptively valid, *see NLRB* v. *Columbia Cable T.V. Co.*, 856 F.2d 636, 638 (4th Cir. 1988), and Overnite must rebut this presumption with "specific evidence not only that the alleged acts of interference occurred but also that such acts sufficiently inhibited the free choice of employees as to affect materially the results of the election." *NLRB* v. *Hydrotherm, Inc.*, 824 F.2d 322, 334 (4th Cir. 1987) (quoting *NLRB* v. *Handy Hardware Wholesale, Inc.*, 542 F.2d 935, 938 (5th Cir. 1976)).

A.

We begin with Lexington. Overnite complains that agents of Local 651 photographed employees as they entered the Lexington terminal to vote on election day. Board precedent allows unions to photograph employees during a unionization campaign, so long as the photography is unaccompanied by express or implicit threats or other forms of coercion. *See Randell Warehouse of Arizona*, 328 NLRB No. 153 (1999),[9] *enforcement denied on other grounds*, *Randell Warehouse of Arizona*, 252 F.3d 445 (D.C. Cir. 2001). Overnite argues, first, that Local 651's surveillance *was* accompanied by threats and coercion, and second, that the Board's use of the *Randell Warehouse* standard is an unreasonable interpretation of the NLRA.

Most of Overnite's examples of "express or implied threats or coercion" are exaggerated, and, moreover, are unrelated to the photo-

---

[9]*Randell Warehouse* overruled the Board's decision in *Pepsi-Cola Bottling Co.*, 289 NLRB 736 (1988), which held that union videotaping of employees during an election campaign is objectionable conduct that warrants setting aside the election, unless the union offers the employees "a legitimate explanation" for the videotaping.

The *Randell Warehouse* standard has no bearing on union photography of employees engaged in picket line activities. *See* 328 NLRB No. 153 n.9.

graphs taken on election day. The comments uttered by pro-Teamster employee Bill Stamper to pro-Company employees were vulgar, but hardly constitute "threats."[10] Although pro-Company employee Bill Clark testified that he overheard someone say "[h]e'll regret the day that he ever took it upon himself to support the Company," J.A. 1326, this incident was unconnected to the photography that took place on election day.

Overnite does reference one arguably threatening incident that occurred on election day, where Mark Stratton, a pro-union employee who had been taking photographs of employees, drove his tractor trailer into a hole that splashed mud on a group of pro-Company employees. J.A. 1291-97. The hearing officer, however, found that the incident was accidental, J.A. 1484, and we are in no position to second-guess his fact-finding and evaluation of the witnesses' credibility. While it is still conceivable that the mud-splashing incident, even though inadvertent, might have made the election-day photography seem more coercive or threatening to some of Overnite's employees, we cannot conclude that the Board abused its discretion in finding otherwise, given the record in the case. It was therefore permissible for the Board to find the union's photography at Lexington unobjectionable under the *Randell Warehouse* standard.

That leaves the question of whether the Board's application of the *Randell Warehouse* standard to this case is a permissible interpretation of the NLRA, which forbids labor organizations from "restrain[ing] or coerc[ing] employees in the exercise of rights guaranteed in section 157 of this title." 29 U.S.C. § 158(b)(1)(A). Among those "rights guaranteed" to employees is the right to refrain from assisting labor unions, *see* 29 U.S.C. § 157, and a union's use of photography or videotape to record employees' anti-union preferences during an organization campaign, may, in some instances, violate the Act by instilling a fear of retaliation against anti-union employees, either by physical violence or economic reprisal in the event the union becomes

---

[10]Stamper told pro-Company employee Gerard Snowden, "I'm kicking ass and taking names," J.A. 1249, but the next day, Stamper apologized to Snowden for the incident. J.A. 1250. Stamper told another pro-Company employee that "if you don't vote for Union you're a dickhead," J.A. 1314, which is not a threat.

certified and gains control over advancement within the company. Overnite believes the *Randell Warehouse* standard will countenance such violations of the Act, by presuming all union photography during a campaign to be legitimate unless the employer can show it was accompanied by "express or implied threats or other coercion."

We have little doubt that there will be some instances of union photography that will be inherently restraining or coercive of the right of employees to exercise their section 7 rights. If the Board condones such actions, under the guise of *Randell Warehouse* or any other standard, a Court of Appeals can and should deny enforcement to its order. We do not think, however, that the Board's application of *Randell Warehouse* to permit the photography at issue at Lexington violated section 8(b)(1)(A) of the Act. The record reveals that the photographers only took pictures of unit employees as they entered the terminal to vote, which does not record how that person voted or whether he or she supports the union. In the absence of any suggestion that the pictures could be used to retaliate against anti-union employees, we cannot conclude that the Lexington photographs were inherently restraining or coercive of the exercise of section 7 rights.

We will enforce the Board's certification of Local 651.

### B.

At Buffalo, Overnite complains that Local 375 agent Mario Bonafede took photographs of employees as they exited the terminal on election day. Bonafede's son also shot eleven minutes of videotape of trucks entering and leaving the terminal during the evening voting session. For the reasons discussed above, we do not believe this use of photography, which simply records the fact that employees voted, not their pro- or anti-union preferences, necessarily constitutes a violation of section 8(b)(1)(A) of the Act, absent reason to believe the photos could be used for a retaliatory purpose. And without evidence of express or implicit threats or other forms of coercion accompanying the photography, we do not believe the Board misapplied its *Randell Warehouse* standard by certifying Local 375. The alleged incidents involving Dave Maloney (a pro-Company employee) who testified that he heard a "thud" against his vehicle as he reported to work on election day) and Bob Carlson (who turned his head away

as his picture was taken) are too isolated and *de minimis* to warrant setting aside an election. *See Hydrotherm, Inc.*, 824 F.2d at 334.

### C.

In Detroit, Local 299 videotaped or photographed members of the unit as they arrived for and left work. Again, the Board found that this photography was not accompanied by express or implied threats or coercion sufficient to set aside the election under *Randell Warehouse*. J.A. 1498-1501.

Overnite relies on examples of alleged threats and coercion in Detroit that it recited before the Board, yet the Board considered these incidents and found that they were not nearly as threatening or coercive as Overnite would have us believe. As an example, Overnite claims that when Larry Schellenberger arrived at work, Jim Rice yelled at him, "Hey, Larry, there goes an Overnite scab." J.A. 1501. Yet the Board found that Schellenberger and Rice were friends who "cut up" together on the job, and that Schellenberger did not feel threatened or coerced by Rice's comment. *Id.* The Board also found that vulgar comments made to Philip McGaha, such as "f—king scab" and "traitor," "could not have constituted interference inhibiting or affecting McGaha's vote because he had already voted at the time that these remarks were made." J.A. 1501.

Overnite recites the testimony in the record but does not endeavor to refute, or even discuss, the Board's characterization of this evidence. As a reminder to Overnite, we are reviewing the Board's decision, not conducting an independent evaluation of the evidence pertaining to the election in Detroit. Simply repeating the testimony regarding threats and coercion that the Board heard, without explaining how the Board erred in its factfinding by not crediting this evidence, does nothing to convince a reviewing court to deny enforcement to the Board's order. Accordingly, we will enforce the Board's certification of Local 299.

### D.

Lastly, we turn to Bowling Green. Overnite relies on an affidavit from employee John Gifford, who says he observed Teamster repre-

sentatives force two Overnite employees to pose for a picture while holding a "Vote Yes" placard. Overnite conveniently ignores the fact that both employees testified themselves that the photographs were voluntary. J.A. 616-17. We find this claim of objectionable conduct to be without merit, and enforce the Board's certification of Local 89.

IV.

Because Overnite refused to bargain with the four locals in Lexington, Buffalo, Detroit, and Bowling Green, the International Brotherhood of Teamsters called a nationwide strike against Overnite to protest. Overnite alleges that this strike has been plagued with violence and seeks a hearing before the Board to present evidence regarding the Teamsters' alleged post-election misconduct as grounds for revoking the four previously-certified elections in Lexington, Buffalo, Detroit, and Bowling Green. *See Laura Modes Co.*, 144 NLRB 1592, 1596 (1963) (denying a union a bargaining order where "the Union evidenced a total disinterest in enforcing its representation rights through the peaceful legal process provided by the Act in that it resorted to and/or encouraged the use of violent tactics to compel their grant"); *Union Nacional de Trabajadores*, 219 NLRB 862, 863 (1975) (revoking a union's certification where the union, "by its brutal and unprovoked physical violence . . . has evinced an intent to bypass the peaceful methods of collective bargaining contemplated in the Act . . .").

To be entitled to an evidentiary hearing, Overnite must make a proffer of evidence "which prima facie would warrant setting aside the election." *The Methodist Home* v. *NLRB*, 596 F.2d 1173, 1178 (4th Cir. 1979) (quoting *NLRB* v. *Bata Shoe Co.*, 377 F.2d 825, 826 (4th Cir. 1967)). Such a proffer, however, may not be conclusory or indefinite but must relate to "specific evidence of specific events from or about specific people." *Id.* (quoting *Electronic Components Corp. of N.C.* v. *NLRB*, 546 F.2d 1088, 1091 (4th Cir. 1976)).

The Board denied a hearing on this issue because it concluded that any alleged misconduct on the part of the *international* union could not be attributed to the four locals under the law of agency. J.A. 1724. It is the conduct of the local unions, as the certified bargaining representatives, rather than the conduct of the IBT, which is a separate

labor organization, that determines whether *Laura Modes* relief is appropriate. J.A. 1724. ("[W]e particularly rely on the fact that the evidence does not show a deliberate plan of violence and intimidation by any of the certified Locals.").

Overnite's proffer fails to aver specific facts showing the use or encouragement of violence by the four local unions it seeks to decertify. Instead, Overnite's proffer repeatedly blames the international union for the violence, insisting that the strike "has been orchestrated, overseen and directed at all times by the IBT and can only be called off by the IBT." J.A. 1541. Overnite did specifically accuse some local union officials of violent misconduct, J.A. 1557, but none of those was an official of any of the four local unions at issue in this case. Nor does Overnite's proffer include specific evidence of an actual or apparent agency relationship that would make the four locals responsible for the actions of the IBT. The simple observation that the locals stand to benefit from the international union's actions does not render them vicariously responsible for the IBT's misdeeds.

## CONCLUSION

The Board's order will be enforced in its entirety, and we accordingly deny Overnite's petition for review.

*ENFORCED*