SIXTH DIVISION November 19, 2004

No. 1-03-1596

RACHELLE LINDSEY and GERALD ROSS,      ) Appeal from the

     ) Circuit Court of

Plaintiffs-Appellants,   ) Cook County.

     )

     )   No. 02 CH 13494

     )

THE BOARD OF EDUCATION OF THE CITY OF
   )   Honorable    

CHICAGO, a body politic and corporate, ARNE
 ) Patrick E. McGann,

DUNCAN, in His Official Capacity 
as Chief
 Executive
 ) Judge Presiding.

Officer, FREDERICK H. BATES, in His Official
   )

Capacity as Hearing Officer, and CARLOS 
AZCOITIA,
 )

in His Official Capacity as Deputy Chief of 
 Education, 
 )

     )

Defendants-Appellees.    ) 

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

This appeal involves the review of an administrative decision.  In May 2002, after plaintiffs Rachelle Lindsey and Gerald Ross lost an election for positions on the Local School Council of a Chicago public school, they challenged the election results.  A public hearing on the challenge was held by the defendant Board of Education of the City of Chicago (Board), but the election results were upheld and plaintiffs' bid for a new election was denied.  Plaintiffs filed a petition for a writ of 
certiorari
 in the circuit court of Cook County, seeking review of the Board's decision which was based on the recommendation rendered by the hearing officer, defendant Frederick Bates.
(footnote: 1)  In May 2003, the court entered an order denying plaintiffs' petition.  Plaintiffs now appeal from the denial of their election challenge, contending that an improper standard was applied in reaching the decision.  We disagree, and affirm the circuit court's decision upholding the Board's denial of plaintiffs' election challenge.

BACKGROUND

Both plaintiffs were members of the Local School Council (LSC) at Dulles Elementary School (Dulles) on South Calumet, who sought to retain their positions in the election that was held on May 1, 2002.  The rules and procedures for the election were set forth in the Board's publication, "A Guide to Local School Council Elections" (Guide).  Among the rules pertinent to this appeal are those prohibiting electioneering within 100 feet of any entrance to the building in which the polling place is located (
i.e.
, the Dulles school building) and providing for the filing of a postelection challenge.

Lindsey had been a parent representative on the LSC prior to the 2002 election, while Ross had been a community representative.  Certain other candidates for LSC positions ran as part of a slate entitled "Look for the Stars" (Stars slate).  All members of the Stars slate won election to positions on the LSC.  Of 12 candidates for 6 parent representative positions on the LSC, Lindsey received the seventh highest number of votes.  Although she came within four votes of the sixth-place candidate, Lindsey was not reelected.  Ross received the fewest votes of the three candidates for two community representative positions, losing reelection to his position by 19 votes.  Only Lindsey and Ross challenged the election.

Plaintiffs filed a postelection challenge petition on May 9, 2002, alleging that an unfair and illegal advantage was given to the Stars slate.  They complained of the use of school resources and electioneering by school personnel in support of the Stars slate candidates.  Quoting a remedies provision in the Guide, plaintiff-challengers sought a new election due to alleged "'unrepaired gross irregularities which substantially affected the integrity of the election process.'" 

In the petition, plaintiffs claimed that the alleged irregularities that occurred on election day stemmed from an ongoing dispute between some of the LSC members and the school administration which had been taking place over the course of several months before the election.  Briefly, the key event in this dispute was a January 2002 vote taken by the Dulles LSC, in which the LSC decided not to renew the contract of the Dulles principal, Donna Clayton (the Clayton vote).  In March 2002, that vote was nullified according to a letter from the Board's general counsel, Marilyn Johnson.  Johnson informed the Dulles LSC that any action taken by it after one member's November 2001 resignation was void due to the lack of a quorum.

A hearing on plaintiffs' postelection challenge was held before hearing officer Bates on May 28, 2002.  Notice of the hearing date and time, which had been provided to plaintiffs, informed them also that the "[f]ailure of any challengers to appear at the hearing may result in dismissal of the challenge."  Ross did not appear at the hearing.  Lindsey arrived late and testified, as did the following four individuals:  another parent member of the Dulles LSC, Sherry Ealy; two associates of an education reform organization, Matthew Hanson and Valencia Rias; and Lakisha Gladney, one of the Stars slate candidates who was elected to the LSC.

At the hearing, Lindsey testified that one employee of Dulles, Chuck Carter, who had been assigned to monitor the election, was hostile to her.  Carter did not permit Lindsey to accompany a voter to the school office for verification of her eligibility to vote, despite an election judge's request that she do so.  One teacher, Lee Brown, spent about 3½ hours outside the school, about 20 feet from the school door, talking to parents who were coming to vote.  Lindsey later complained when she observed Brown assisting a voter in the voting booth; an election judge directed Brown to leave, which he did.

Lindsey further testified that at one point, she encountered numerous parents outside the school who had voted and who had fliers for the Stars slate.  One parent told Lindsey that she obtained the flier inside the school from an unnamed person.  Lindsey later saw one of the Stars slate candidates distributing fliers outside the school, but within 100 feet of the school entrance.  Lindsey heard that candidate say that she ran out of fliers, but that candidate later exited the school with fliers which were "identical" to the slate's original fliers, which had been printed on blue paper, but which were reproduced on white paper.

Sherry Ealy, who was a member of the Dulles LSC at the time of the Clayton vote and who was reelected, testified that one teacher, Anthony Brown, stood outside, about 20 feet from the school entrance, urging voters not to cast their votes for certain candidates.  He did that intermittently for about four hours.  Ealy did not know, however, which candidates Brown supported.  When Ealy began to pass out her campaign literature at a distance from the school that had been measured and determined permissible, she was directed by Chuck Carter to move farther away.  Another candidate electioneered within 50 feet of the school, but no action was taken against her.

Matthew Hanson, a research associate with an education research and reform organization, testified as to his analysis concerning the voting data from the Dulles LSC election, which led him to conclude that the Stars slate was unfairly advantaged.

Valencia Rias, another associate of the reform organization, testified that she was present as a pollwatcher at Dulles on May 1.  She observed what she termed "inequitable enforcement of the 100-foot rule," in that one of the Stars slate candidates, Lakisha Gladney, was passing out her campaign fliers inside the school.  Rias saw Gladney carry a "'Dunkin' Donuts' bag full of" the slate's fliers into a classroom and distribute her campaign literature within the school.  An election judge did not take any action against Gladney.

Rias later saw other candidates distributing literature within 100 feet of the school.  When she informed those candidates that they were not allowed to distribute campaign literature that close to the school, they moved farther away, complying with Rias' request.  Rias saw people carrying copies of the Stars slate fliers that were reproduced on white paper, but she acknowledged that the copies could have been made at a nearby drug store.

Plaintiffs' counsel then requested additional time for the submission of a posthearing brief and affidavits, which the hearing officer allowed.

Finally, Lakisha Gladney testified, denying that she passed out blue fliers inside the school or within 100 feet of the school building.  Gladney stated that she first distributed campaign literature on a neighboring property during the morning, then she did so in a store across from the school.  When she ran out of literature, Gladney returned home and got additional blue fliers, which she distributed at several different businesses during the day.  Gladney admitted that she carried a "Dunkin' Donuts" bag inside the school, but she carried only her children's report cards and folders in it.

Plaintiffs' attorney subsequently submitted written statements from Lindsey, Ealy, and Rias, and sworn statements from four other supporters of the election challenge--Lindsey's son; a parent, Kellie Antoine; a community resident, Jaqueline Mcaffee; and a teacher, Brenda Ford--who could not attend the hearing in person.  According to her statement, the day before the LSC election, Ford saw a librarian using a particular copier in the school which the librarian did not normally use.  Ford saw blue paper by the copier, and, when she later saw a copy of the flier for the Stars slate, she recognized the text and font to be the material that the librarian was copying.  Antoine and Mcaffee both stated they were inside the school building, on the second floor, on election day when an unnamed teacher's aide handed them fliers for the Stars slate.  Lindsey's son, Earl, stated he worked as a poll watcher on election day and saw copies of the Stars slate flier which had been reproduced on both blue and white paper.

Hearing officer Bates issued a written decision on June 11, 2002, in which he recommended denying the petition challenging the election.  In his analysis, Bates noted that evidence had been offered that both sides engaged in electioneering within 100 feet of the school building, and that a motive for the conduct alleged had been demonstrated by the account of events involving the LSC in the months prior to the election.  He acknowledged that four affidavits had been submitted in support of the challenge, and, while he termed the allegation of electioneering by an unnamed teacher's aide (raised in the Antoine and Mcaffee affidavits) "extremely troubling," Bates found the allegation unpersuasive in part because the affiants could not be examined.  Bates also noted that some of the alleged violations had been corrected and other allegations, even if true, did not amount to violations of any rules.  Bates further noted that a report submitted by Hanson was apparently based on extrapolations of census data and did not establish that unlawful electioneering was outcome determinative of the LSC elections at Dulles.

In reaching his decision, Bates found certain allegations vague, requiring so much conjecture and speculation as to lack "sufficient indicia of reliability."  Additionally, while acknowledging contrary testimony in the affidavits, Bates specifically found Gladney to be credible.  In contrast, when considering testimony offered by Rias and Lindsey, Bates found certain allegations of electioneering "unlikely" to be as bad as perceived and susceptible of other interpretation.  Bates determined that although the challengers had the burden of proving their allegations by "a preponderance of the evidence, sufficient evidence to support a decision sustaining the Post-Election Challenge," they did not do so.  Finally, Bates concluded the challengers had not proved by a preponderance of the evidence "that unrepaired gross irregularities occurred which substantially affected the integrity of the election process, or affected the outcome of the election," and recommended that the petition be denied.

Two days later, in a letter from defendant Azcoitia, the Board affirmed Bates' recommendation to deny the election challenge and set July 1, 2002, as the date for the elected candidates to take office.

Plaintiffs subsequently filed a complaint for a common law writ of 
certiorari
, seeking a reversal of the denial of their election challenge and a new LSC election.

On May 6, 2003, the circuit court issued a written order denying plaintiffs' petition for the writ.  In its order, the court set forth the appropriate standard of review for a common law writ of 
certiorari
 as essentially the same as the standard applied under the Administrative Review Law.  See 735 ILCS 5/3-101 
et seq.
 (West 2002).  The court then determined that the issue of an allegedly incorrect standard applied by the hearing officer was an issue of law, which was to be reviewed 
de novo
.  The court ultimately found that the hearing officer applied the correct standard, of the preponderance of the evidence, even if he incorrectly ascribed that standard to the Illinois Election Code.  See 10 ILCS 5/2A-1 
et seq.
 (West 2002).  The court further found that the record contained substantial support for Bates' decision, which was not against the manifest weight of the evidence.

Plaintiffs then filed this appeal, raising issues that concern the standard applied by the hearing officer.

ANALYSIS

At the outset, we address defendants' request that this court strike "numerous argumentative and baseless 'statements of fact'" set forth in the plaintiffs' brief.  They ask that several sentences and two entire paragraphs in the brief be stricken pursuant to Supreme Court Rule 341(e)(6), which requires facts to be stated accurately, without argument or comment, and with appropriate references to the record.  See 188 Ill. 2d R. 341(e)(6).  Defendants assert that the designated portions of plaintiffs' brief are either unsupported by the citations to the record provided or argumentative, or both.  We acknowledge the inaccuracy or omission of adequate citation to the record provided, which defendants have pointed out in plaintiffs' brief.  However, despite these deficiencies, because the portions of plaintiffs' brief designated by defendants are not dispositive to our decision, we will not strike them.

In their brief, plaintiffs present three issues:  whether (1) the court improperly "dismiss[ed]" their complaint "where the hearing officer's findings of fact, and final opinion, were based on an erroneous legal standard"; (2) the hearing officer's alleged use of an "outcome-determinative standard based on the Illinois Election Code" was improper; and (3) the court erred by refusing to overturn the hearing officer's decision, because the court agreed that the "outcome determinative" test was properly applied.  Despite their statement designating three issues, plaintiffs raise six separate points in the argument section of their brief, making their arguments at times repetitive and confusing.  Essentially, though, plaintiffs appear to raise two primary issues, and we consider them as such: whether the hearing officer applied the proper standard of proof to plaintiffs' allegations in the postelection challenge, and whether plaintiffs, as challengers, satisfied the burden of proof for overturning the election.

Initially, we note that circuit court review of the Board's decision is obtained by the filing of a common law writ of 
certiorari
, which plaintiffs here properly filed.  See 
Hanrahan v. Williams
, 174 Ill. 2d 268, 272, 673 N.E.2d 251 (1996).  As the court here acknowledged in its order, the standards of review under a common law writ of 
certiorari
 are essentially the same as those under the Administrative Review Law.  See 735 ILCS 5/3-101 
et seq.
 (West 2002); 
Hanrahan
, 174 Ill. 2d at 272.
  We further note, as a preliminary matter, that this court reviews the administrative agency's decision and not that of the circuit court.  See 
Gounaris v. City of Chicago
, 321 Ill. App. 3d 487, 491, 747 N.E.2d 1025 (2001). 

The standard applied on review of an agency's decision depends upon whether the issue presented is one of fact or of law.  
Carpetland U.S.A., Inc. v. Illinois Department of Employment Security
, 201 Ill. 2d 351, 369, 776 N.E.2d 166 (2002).  Purely factual findings made by an administrative agency are reviewed under a manifest weight of the evidence standard.  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369.  Under such review, the agency's findings are 
entitled to deference, being deemed 
prima facie
 true and correct.  See 735 ILCS 5/3-110 (West 2002); 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369; 
Launius v. Board of Fire & Police Commissioners of the City of Des Plaines
, 151 Ill. 2d 419, 427, 603 N.E.2d 477 (1992).

Where the agency's decision involves a pure question of law, however, the decision is not entitled to the same degree of deference, but is instead reviewed 
de novo
.  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369; 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205, 692 N.E.2d 295 (1998).

In order to determine the appropriate standard of review for this case, we must address plaintiffs' characterization of the issues they raise as involving the application of the proper "standard."  Plaintiffs assert that the questions of the "choice and application of the correct standard of review," applied by the hearing officer, are "plainly" questions of law.  As such, plaintiffs argue, they are entitled to 
de novo
 review.

While a question about the application of an incorrect standard of review would be one of law, plaintiffs' issues concerning standards actually appear to challenge the decision rendered by the hearing officer.  In essence, the contention underlying each of the variously designated issues is that the integrity of the May 2002 LSC election at Dulles was affected by irregularities, requiring a new election to be ordered, and that plaintiffs presented sufficient evidence of these irregularities at the postelection hearing.  All the issues raised by plaintiffs, then, rest upon a determination of whether the hearing officer applied the proper standard of proof to the evidence presented by plaintiffs.

However, in stating their issues, plaintiffs repeatedly fail to distinguish between the standard, or burden, of proof required by the agency--
i.e.
, the Board--and the standard applied on judicial or appellate review of an agency's decision.  Plaintiffs repeatedly argue that an incorrect "standard of review" was applied by the hearing officer.  Because the hearing officer did not review any decision but, rather, heard evidence and reached a conclusion upon which he based his recommendation, we do not see how a standard of review is pertinent to the hearing officer's decision.  Rather, in this context, we take plaintiffs' use of "standard" to refer to the standard or burden of proof to which they were held at the hearing.  Further, plaintiffs acknowledge that decisions of administrative agencies are reviewed under a standard of manifest weight of the evidence, but they argue that appellate review here involves the legal question of the "standard of review" applied below.  However, as stated earlier, plaintiffs' issues apparently concern the hearing officer's application of the facts presented at the hearing to the law concerning the LSC election process. 

Defendants recognize this and set forth the appropriate standard of appellate review.  As defendants maintain, the issues in this appeal involve the determination of the legal effect of certain facts, 
i.e.
, whether sufficient irregularities occurred in the LSC election as to substantially affect the integrity of the election process.  Thus, this makes the issues presented by plaintiffs mixed questions of law and fact, which are subject to a clearly erroneous standard of review.  

Where the fact finder examines the legal effect of a given set of facts, it decides a mixed question of law and fact, which is subject to an intermediate standard of review.  See 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369; 
City of Belvidere
, 181 Ill. 2d at 205.  Under such circumstances, the decision is based on fact-finding that is inseparable from the application of law to fact and is reviewed under a clearly erroneous standard.  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369; 
Gounaris
, 321 Ill. App. 3d at 491.

This case involves the examination by the hearing officer of plaintiffs' allegations of rule violations occurring in the LSC election procedure.  The hearing officer had to determine the legal effect of the purported violations.  That is, he had to determine whether the alleged electioneering and misuse of school resources constituted "gross unrepaired irregularities" that substantially affected the integrity of the LSC election.  Because the hearing officer's decision was based on fact-finding that is inseparable from the application of law to fact, the decision is reviewed under a clearly erroneous standard.  See 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369.  Under this standard, a reviewing court reverses an agency decision only if, after review of the entire record, the court is left with the conviction that a mistake was committed.  See 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369.

I. Application of Proper Standard by Hearing Officer

Plaintiffs first argue that the hearing officer's decision must "conform to the correct standard of review," which is, they insist, a statutory "integrity" standard set forth in the Board's own regulations.  They assert that the hearing officer instead improperly applied an "impermissible 'outcome determinative' standard" which, they claim, he "lifted" from the Illinois Election Code.  Plaintiffs rely upon sections of the School Code providing that the Board may promulgate its own rules and regulations for the election procedure as their support for the proposition that the Board's rules, as set forth in the Guide, constitute statutory standards.  See 105 ILCS 5/34-2.1(n) (West 2002).

However, defendants do not dispute that the Board has the statutory authority, under section 34-2.1(n) of the School Code (see 105 ILCS 5/34-2.1(n) (West 2002)), to make its own rules and regulations for the LSC elections.  Nor do they dispute that the Illinois Election Code is inapplicable to school elections.  See 10 ILCS 5/2A-1(a) (West 2002).  Rather, at issue is plaintiffs' interpretation of certain of the Board's rules which apparently provide the basis for plaintiffs' claim that a distinct, statutory "integrity" standard applies to evidence presented in  school election cases.  In making this claim, plaintiffs rely exclusively upon language contained in a provision of the Guide which sets forth available remedies for election challenges.

The specific rules and procedures for challenging election results are set forth in one section of the Guide, which is entitled "After Election Day: Post-Election Challenges to Election Results."  That section contains three subsections--"Overview," "Hearing Procedures," and "Remedies"--the latter of which provides several examples of potential remedies available to election challengers.  As an introduction to those examples, the "Remedies" subsection states:

"When the post-election challenge hearings are over the Chief Education Officer or designee shall order appropriate remedies for any deficiencies proved, including (but not limited to); the declaration that the particular Local School Council member-elect is ineligible to serve in the position to which he or she was declared elected; that a recount of ballots shall be conducted and that the person(s) found in the recount to have been elected shall be declared elected; or that, because of unrepaired gross irregularities which substantially affected the integrity of the election process, a new election must be conducted."

One of the examples provided in the subsection addresses the remedy of a new election.  According to that example, a new election would be appropriate where certain challenges to the election are upheld.  Specifically, that example states:

"If the challenge is based on an allegation of 
unrepaired gross irregularities which substantially affected the integrity of the election process
 with regard to some or all classes of candidates and if the challenge is upheld, the affected portion of the election will be declared null and void and a new election ordered for such class(es), to be conducted with any additional safeguards instituted necessary to prevent the reoccurrence of the irregularities found." (Emphasis in original.)

Plaintiffs rely upon this language addressing the remedy for unrepaired gross irregularities for their insistence that there is a distinct, statutory "integrity" standard.  Such standard, plaintiffs claim, is more stringent than the purported outcome-determinative standard that the hearing officer applied.  However, what plaintiffs fail to distinguish in making this argument is that the "gross irregularities" language, contained in both the introductory paragraph and example of the remedies subsection, addresses what must be proved to overturn an election rather than how such allegations must be proved: "[T]he Chief Education Officer *** shall order appropriate remedies 
for any deficiencies proved
, including *** unrepaired gross irregularities which substantially affected the integrity of the election process."  (Emphasis added.)  That is, the "unrepaired gross irregularities" would be one type of deficiency which must be proved in order for the remedy of a new election to be ordered.  This provision does not, however, direct how--that is, by what standard--such deficiency must be proved.  Therefore, as we read it, this provision of the Guide does not set forth any standard of proof or, for that matter, any standard of review.

Rather, the standard of proof that election challengers must satisfy is explicitly provided elsewhere in the Guide.  That standard is the preponderance of the evidence.  In fact, the remedies subsection relied upon by plaintiffs specifically refers to the "Post-Election Challenge Rules for Hearings."  One of those rules states: "The petitioners shall have the burden of going forward and of presenting sufficient evidence to support a decision sustaining the Post-Election Challenge Petition by 
preponderance of the evidence
." (Emphasis added.)

Despite the clear direction in the Guide that the election challengers must satisfy their burden of proof by a preponderance of the evidence, plaintiffs make numerous additional points in support of their argument for an "integrity" standard.  To that end, plaintiffs supply dictionary definitions of the word "integrity," from which they urge this court to glean the "plain meaning" of an integrity standard.  Further, contradicting their repeated insistence that the Illinois Election Code is inapplicable to this school election, plaintiffs rely upon Election Code cases to support their plain meaning claim.  See 
Pullen v. Mulligan
, 138 Ill. 2d 21, 561 N.E.2d 585 (1990); 
Craig v. Peterson
, 39 Ill. 2d 191, 233 N.E.2d 345 (1968).  Plaintiffs further urge this court to look to several federal court and labor board decisions (
Overnite Transportation Co. v. National Labor Relations Board
, 294 F.3d 615 (4th
 Cir. 2002); 
National Labor Relations Board v. Wis-Pak Foods, Inc.
, 125 F.3d 518 (7th
 Cir. 1997); 
Superior Emerald Park Landfill, LLC
, 340 N.L.R.B. No.54 (September 30, 2003)) involving union elections, and adopt a proper standard for our school elections from these cases.  Plaintiffs also offer canons of statutory construction as a guide for reading sections of the School Code and the Illinois Election Code, from which a proper standard for school elections is to be discerned.  However, as stated earlier, the Guide clearly sets forth the standard of proof--a preponderance of the evidence--which the election challengers must meet.  Therefore, we need not resort to canons of construction, nor search for standards in dictionaries, federal union election cases, or elsewhere.  

Further, in his written decision, the hearing officer set forth, among other relevant authority, the rule from the Guide that governs the burden of proof.  He clearly referenced the preponderance of the evidence as the appropriate standard of proof that the election challengers must meet: "The Petitioners in this case have the burden of proving, by a preponderance of the evidence, sufficient evidence to support a decision sustaining the Post-Election Challenge Petition *** but *** the hearing officer cannot conclude that the Challengers have proven by a preponderance of the evidence that unrepaired gross irregularities occurred."  
Cf
. 
Board of Education of the City of Chicago v. State Board of Education
, 113 Ill. 2d 173, 195-96, 497 N.E.2d 984 (1986) (although proper standard of proof was preponderance of the evidence and hearing officer applied wrong standard of clear and convincing evidence, not all cases where hearing officer applies incorrect standard require remand).  Therefore, as to the hearing officer's application of the correct standard of proof, after reviewing the written decision and the entire record, we are not left with the conviction that a mistake was committed.  See 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369.

II. Application of Standard to Plaintiffs' Evidence 

Plaintiffs eventually acknowledge, in the third argument of their brief, the preponderance of the evidence standard specified by the Guide, but they argue that the hearing officer did not weigh or compare evidence presented by the parties.  In arguments numbered III, IV, and V of their brief, plaintiffs variously insist, again, that the hearing officer impermissibly applied a "standard of review *** higher than the 'preponderance of the evidence,'" and that their evidence was more than a preponderance and they "preponderated in establishing 'unrepaired gross irregularities which substantially affected the integrity of the elections [
sic
] process.'"

We consider these arguments together, but we first note that, taken as a whole, plaintiffs' arguments concerning the evidence they presented to challenge the election are almost entirely devoid of any pertinent legal authority, in contravention of the requirements of Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)).  Because points that are not supported by citation to relevant authority fail to satisfy the requirements of Rule 341(e)(7), they may be considered waived by the reviewing court.  See 
Dillon v. Evanston Hospital
, 199 Ill. 2d 483, 493, 771 N.E.2d 357 (2002). 
Here, plaintiffs cite additional federal labor cases (see 
K-Mart Corp. v. National Labor Relations Board
, 62 F.3d 209 (7th
 Cir. 1995); 
Henderson Trumbull Supply Corp. v. National Labor Relations Board
, 501 F.2d 1224 (2nd
 Cir. 1974)) to support only broad propositions concerning the impropriety of overreaching in an election situation, but those cases are not applicable to the facts here.  Further, plaintiffs inappropriately attempt to rely upon what appear to be other Board decisions involving school elections (
e.g.
, 
Avalon Park
 (2000); 
Matter of Post-Election Challenge Petition Regarding Lindblom Technical High School
, 
(May 19, 2000)).  Yet, despite plaintiffs' failure to cite appropriate legal authority, we 
choose to address these arguments in exercise of our discretion
.  See 
Dillon
, 199 Ill. 2d at 493
; see also 
Fender v. Town of Cicero
, 347 Ill. App. 3d 46, 51, 807 N.E.2d 606 (2004) (dismissal of appeal for failure to comply with Rule 341 not mandatory). 

Plaintiffs' one-page argument concerning the purported higher standard applied by the hearing officer consists of a repetition of their earlier assertions about an outcome-determinative "standard" and an expression of their dissatisfaction with postelection challenge procedures.  Here, and throughout their brief, plaintiffs argue that the hearing officer applied an outcome-determinative test to their evidence.  They assert that such test was improper because it is based in the Illinois Election Code and is a more stringent than the test required by the School Code or the Guide.

Again, the parties agree that the Illinois Election Code is not applicable to LSC elections.  The hearing officer's written decision does not include the Illinois Election Code
 among its statutory authorities nor does it demonstrate improper reliance upon any provisions contained in the Illinois Election Code itself.  Rather, the decision explicitly cites the School Code and the Guide as the relevant statutory provisions and Board policies.  As we have already stated, in its entirety, the written decision does not leave us with the conviction that a mistake was committed in the hearing officer's 
application of the correct standard of proof.
  In reaching his conclusion, however, the hearing officer distinguished between mandatory and directory election laws, and in so doing, he cited two general election law cases (
Pullen v. Mulligan
, 138 Ill. 2d 21, 561 N.E.2d 585 (1990); 
Natural Products Co. v. County of DuPage
, 314 Ill. 74, 145 N.E.2d 298 (1924)) for this distinction; he then determined the provisions in the Guide were directory.
  The hearing officer also cited 
Lisk v. Benjamin
, 105 Ill. App. 3d 51, 433 N.E.2d 1154 (1982), which involves an election contest governed by the Illinois Election Code, for the proposition that, "Mere proof of irregularities or violations in election procedures is not sufficient to overturn an election unless those irregularities or violations affected the outcome of the election."  Lastly, the hearing officer stated his conclusion in the disjunctive, finding the plaintiffs had not "proven by a preponderance of the evidence that unrepaired gross irregularities occurred which substantially affected the integrity of the election process, or affected the outcome of the election," before recommending that the petition be denied.

The decision as a whole, however, reflects that the hearing officer understood and applied the proper test to the evidence presented by the election challengers.  While the hearing officer may have reasoned that the proper standard was also required by the Illinois Election Code, he nonetheless articulated the preponderance of the evidence standard as the burden the challengers were required to sustain.  In fact, the hearing officer repeatedly referred to the correct preponderance of evidence standard and he considered whether, as provided in the Guide, there were unrepaired gross irregularities which substantially affected the integrity of the election process.  
Cf.
 
Board of Education of Minooka Community Consolidated School District No. 201 v. Ingels
, 75 Ill. App. 3d 334, 337, 394 N.E.2d 69 (1979) (administrative tribunal never addressed precise question of whether conduct at issue was proved by a preponderance of the evidence).  Neither the 
citations to the general election cases nor the finding of a lack of affect on the outcome of the election persuade us that the hearing officer applied an improper standard or was mistaken in the burden that the challengers were required to sustain.  Accordingly, we find no clear error committed by the hearing officer in the application of the burden of proof to the evidence presented by the challengers.  See 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369. 

Next, plaintiffs complain that, apparently as part of the purported application of a more stringent standard, they had an inadequate amount of time to prepare for the hearing.  In so doing, plaintiffs admit the deficiencies of their case and the shortcomings of their legal representation: they concede that they "were unlikely to be able to discover *** notes or documentary evidence of improprieties."  Plaintiffs further admit that the witnesses testified "without being questioned by an attorney who might have elicited more legally relevant information."

These concessions notwithstanding, the parties agree that the School Code provides the authority for the Board to make its own rules and regulations for LSC elections (see 105 ILCS 5/34-2.1(n) (West 2002)), and those rules and regulations, which include procedures for postelection challenges, are set forth in the Guide.  Yet, plaintiffs' apparent admission of their inadequate preparation for the hearing would seem to constitute an admission of their own violation of the Guide's requirement that "[a]t the date and time set for hearing, both the petitioners and the person challenged must be prepared to present their case."  There is no dispute that the Board's statutory authority to set its own rules extends to its requirements that election challengers be prepared to make their case at the postelection hearing. 

Plaintiffs additionally complain about the hearing officer's manner of conducting the proceedings and the time limitations imposed.  Defendants contend that these complaints, like those stated above, are waived on review due to plaintiffs' failure to raise them before the hearing officer.  See 
Sanchez v. Ryan
, 315 Ill. App. 3d 1079, 1084, 734 N.E.2d 920 (2000) (issues not raised before an agency will not be considered on administrative review).  However, we elect to address these complaints (see, 
e.g.
, 
Dillon
, 199 Ill. 2d at 493
)
, if only to find them likewise meritless, given other procedural rules set forth in the Guide.  The Guide gives the hearing officer "exclusive control over the conduct of the proceedings" and specifically provides that the hearing officer "take necessary action to avoid delay" and "to regulate the course of the hearings."  Again, the Board's statutory authority to make these rules is undisputed.  See 105 ILCS 5/34-2.1(n) (West 2002).

More importantly, however, plaintiffs' admissions about their inadequate preparation and presentation at the hearing also undermine their further assertions that they presented sufficient evidence to prevail in their challenge.  Although plaintiffs essentially admit, on one hand, that there are deficiencies in their case, they claim nonetheless that they presented more than sufficient evidence of electioneering and misuse of school resources to satisfy the Board's preponderance standard for overturning the LSC election.  Specifically, plaintiffs claim they presented "unanswered" evidence establishing that the Star slate was improperly favored in the election process.  However, a preponderance of evidence is not simply unanswered evidence; rather, it is evidence that renders a fact more likely than not.  See 
Lyon v. Department of Children & Family Services
, 209 Ill. 2d 264, 279, 807 N.E.2d 423 (2004).  Plaintiffs argue that their witnesses' testimony established their allegations of the "improper acceptance of late-submitted campaign literature" and of the replication of the Star slate's literature with school resources and its distribution within the 100-foot limit.  To the extent these subjects were even addressed in testimony, the evidence presented did not render the facts more likely than not.  See 
Lyon
, 209 Ill. 2d at 279.

First, we note that no allegations whatsoever concerning improprieties in the acceptance of campaign literature were raised in the postelection challenge petition, nor did any witnesses at the hearing so testify.  At most, the charge was raised only in Lindsey's written statement, where Lindsey claimed that she was unfairly treated by school personnel on the deadline date for submission of campaign literature (April 25, 2002) when she brought her campaign materials to the school for literature distribution day.  However, she admitted that her literature was accepted and she was given a receipt for it.  Moreover, Lindsey also admitted that she did not see any other candidates deliver their campaign materials.  Accordingly, no improprieties were established concerning the school's acceptance of campaign literature.

Next, as far as the use of school resources is concerned, both Lindsey and Rias testified that they saw opposition candidates with fliers printed on white paper.  Even if the literature for the opposition slate candidates originally had been printed on blue paper, however, this testimony does not establish the use of any school resources to replicate the fliers: Rias admitted that the fliers could have been made at a store close to the school.  Moreover, the only evidence of the actual use a school resource, a copier, was provided in Ford's statement, but the statement did not establish that the copier was used improperly.  Instead, it provided evidence only that a librarian used a school copier in a room where there was also a pack of blue paper, and thus, it would not make a claim of the misuse of school resources more likely than not.

Finally, as to the improper distribution of campaign literature, Lindsey and Ealy testified that one of the opposition candidates (Tanya Regulus, also referred to as Tanya Rutlers) passed out her literature within 100 feet of the school; Rias testified that Gladney distributed her literature inside the school and other candidates improperly distributed literature outside but, upon her request, they moved farther away; and according to two sworn statements, an unnamed teacher's aide also distributed literature to Antoine and Mcaffee inside the school.  Gladney denied passing out any literature in the school, and the hearing officer found her testimony credible.  We will not disturb the hearing officer's finding of credibility, nor would we invalidate the decision based on conflicting testimony of Gladney and Rias.  See 
O'Neill v. Rodriguez
, 298 Ill. App. 3d 897, 903, 699 N.E.2d 1081 (1998); 
Letourneau v. Department of Registration & Education
, 212 Ill. App. 3d 717, 726, 571 N.E.2d 783 (1991); 
see also 
Piotrowski v. State Police Merit Board
, 85 Ill. App. 3d 369, 374-75, 406 N.E.2d 863 (1980).  Given the finding that Gladney was credible, that leaves evidence of one teacher's aide handing two individuals, Antoine and Mcaffee, literature, and of another candidate, Regulus, passing out her literature impermissibly close to the school.

In considering this evidence, according to rules set forth in the Guide, the hearing officer was to determine if those facts demonstrated "substantial and uncured election violations."  Therefore, the question was not whether some violations of the Board's rules occurred, but whether they were substantial and uncured.  Here, the improper distribution of campaign literature in these instances does not establish that any votes were actually influenced: there is no evidence as to voters, other than Antoine and Mcaffee, receiving and actually reading the literature, much less of changing their votes based on the literature.  Again, the determination to be made was not whether a single violation occurred, or even several, but whether there were substantial violations that would constitute "gross irregularities."  Accordingly, we believe there was no error in the hearing officer's conclusion, based on those facts, that plaintiffs failed to establish "by a preponderance of the evidence that unrepaired gross irregularities occurred which substantially affected the integrity of the election process."  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 369.

Finally, plaintiffs assert that the circuit court, in upholding the Board's decision, also inappropriately applied an "incorrect standard" from the Illinois Election Code.  Again, we review the actions of the Board, not those of the circuit court.  
Gounaris
, 321 Ill. App. 3d at 491.  Therefore, we do not address this assertion.

CONCLUSION

In sum, the record in this case supports the hearing officer's conclusion that plaintiffs did not prove, by a preponderance of the evidence, that the facts they alleged constituted unrepaired gross irregularities which substantially affected the integrity of the LSC election at Dulles on May 1, 2002.  Accordingly, the hearing officer appropriately recommended that plaintiffs' election challenge be denied.  We affirm the Board's decision and the circuit court's determination upholding the Board. 

Affirmed.

TULLY 
and 
O'MARA FROSSARD, JJ., concur.

FOOTNOTES
1: Also named as defendants are Arne Duncan, in his official capacity as the chief executive officer, and Carlos Azcoitia, in his official capacity as deputy chief of education
.