SIXTH DIVISION
March 30, 2007

No. 1-05-0157


FARID SWEILEM and KHALIL SWEILEM,  )     Appeal from the
                                      )     Circuit Court
    Petitioners-Appellants,      )     of Cook County.
                                        )
    v.                           )     Nos. 01 L 51089 and
                                      )        01 L 51090
ILLINOIS DEPARTMENT OF REVENUE,   )
ILLINOIS DEPARTMENT OF REVENUE    )
BOARD OF APPEALS; and DIRECTOR of )
THE ILLINOIS DEPARTMENT OF       )
REVENUE,                           )     The Honorable
                                      )     Alexander P. White,
    Respondents-Appellees.      )     Judge Presiding.


     JUSTICE O'MALLEY delivered the opinion of the court:

     Appellant-taxpayers Farid and Khalil Sweilem (taxpayers) appeal the judgment of the circuit court of Cook County affirming the denial by the Illinois Department of Revenue (the Department) of taxpayers' request to vacate notices of penalty liability (NPL) and remand the matter to the Department for a hearing on the issue of taxpayers' personal liability. Taxpayers allege that the Department's NPL's were ineffective because it failed to notify their attorneys pursuant to statute and, alternatively, if the NPL's were properly issued to taxpayers, the Department failed to meet due process requirements for notice under the Illinois and the United States Constitutions.

     For the reasons that follow, we reverse the judgment of the

circuit court and the ruling of the board of appeals and remand this matter for further proceedings.

## BACKGROUND

In 1977 taxpayers purchased Jet Food Market, a grocery store in Chicago, Illinois. Farid was the president of Jet Foods Inc., and Khalil was the secretary. On December 2, 1984, the Department issued a notice of taxpayer liability to Jet Foods for deficiencies for a period of time beginning in July 1978, through November 1981, pursuant to the Retailers' Occupation Tax Act (the Act) (Ill. Rev. Stat. 1981, ch. 120, par. 440 et seq. (currently 35 ILCS 120/1 et seq. (West Supp. 2005)). The amount of liability assessed against Jet Foods, including interest, deficiency penalties, fraud penalties and the underlying tax owed, was $476,622.63. Taxpayers hired the law firm of Barnstein & Berman to represent Jet Foods in the proceedings initiated by the Department.

In December 1986, a hearing commenced but was continued, when taxpayers discharged their law firm during the course of the hearing. Taxpayers hired the law firm of Burke & Smith and proceeded with the hearing on June 4, 1987. Following the June 4, 1987 hearing, the administrative law judge (ALJ) found that Jet Foods was liable for the unpaid sales tax and assessed against taxpayers an amount of $431,272.39. The amount

represented liability for the underlying sales tax, deficiency penalty and interest; however, the ALJ specifically held that the evidence did not support the imposition of a 20% civil fraud penalty.  The Department attempted to collect the debt from Jet Foods in 1988, but was unsuccessful because the corporation had been involuntarily dissolved by the Illinois Secretary of State prior to 1987 and was insolvent.

On October 13, 1989, the Department issued NPL's to taxpayers based on their liability as corporate officers for Jet Foods' unpaid sales tax amounting to $149,612.06, penalties of $8,441.60 and interest of $477,218.97, totaling $635,272.63.  The NPL's were sent to addresses listed on taxpayers' most recent Illinois income tax returns.  Farid's NPL was returned to the Department marked "undeliverable" by the United States Postal Service.  Khalil's NPL was returned by the post office to the Department on October 19, 1989, and bore a sticker indicating that Khalil had moved to a new address and notifying the Department of the new address.  The Department chose not to forward the NPL to Khalil's new address.  On October 31, 1989, Farid directed attorney John Wickert from the law firm of Burke & Smith to file a power of attorney with the Department reflecting Farid's new address and signature as president of Jet Foods.

On June 1, 1990, taxpayers filed petitions with the

Department seeking to vacate the NPL's, reopen the matters and hold hearings on taxpayers' personal liability for the corporate tax deficiency. Both taxpayers alleged that the NPL's were not received and should have been delivered to their attorneys Burke & Smith. Khalil alleged that he was not a responsible person and Farid alleged that his failure to pay taxes on behalf of the corporation was not willful. The Department summarily denied both petitions.

Taxpayers filed separate petitions for writs of <u>certiorari</u> in the circuit court and following several successful motions to dismiss by the Department, the circuit court granted both writs for <u>certiorari</u> in 1997. Following a review of the matter, the circuit court remanded it back to the ALJ for a hearing to determine whether the Department complied with section 12 of the Act (Ill. Rev. Stat. 1989, ch. 120, par. 451). Section 12 of the Act provides, in pertinent part:

> "Whenever notice is required by this Act, such notice may be given by United States registered or certified mail, addressed to the person concerned at his last known address, and proof of such mailing shall be sufficient for the purposes of this Act. Notice of any hearing provided for by this Act shall be so given not less than 7 days prior to the day fixed for the hearing. Following the initial contact of

4

a person represented by an attorney, the Department shall
not contact the person concerned but shall only contact the
attorney representing the person concerned."  Ill. Rev.
Stat. 1989, ch. 120, par. 451.

On December 2, 1999, a hearing was held before a Department ALJ pursuant to the circuit court's remand order.  Taxpayers called attorney Richard Miller, Farid and Khalil Sweilem and Carol Harper as witnesses.  Attorney Miller testified that he represented Jet Foods and taxpayers individually in 1987.  He testified that in or around April 1987, a document was issued by the Department commanding the appearance of taxpayers before an ALJ for a hearing.  Attorney Miller stated that it was the same ALJ that ultimately heard the case against Jet Foods on June 4, 1987.  He testified that he was engaged by taxpayers to represent them individually at this hearing.  Attorney Miller characterized the meeting as unusual and "much more informal than the subsequent one that [was] had in terms of witnesses were not sworn in, there was no court reporter.  It was more in the order of a hearing, if you will, to show probable cause why the brothers should not be added to the Jet Foods lawsuit that was underway, and in which there was a formal charge of fraud [pending] for years ***."

Attorney Miller testified that he, taxpayers,

representatives from the Department and the ALJ were present. During the course of the hearing, the issue was limited to whether or not taxpayers could be liable for the corporate tax deficiency. He stated during his testimony that "[his] clients were very visibly pleased because essentially the whole issue of why we were there was whether or not in their personal capacity they should be responsible for substantial dollars in potential tax revenue which was going to be the subject of the subsequent adjudication against Jet Foods." Attorney Miller argued that taxpayers should not be held personally liable and, according to his testimony, the ALJ agreed finding that there was no basis to pursue the individuals.

On cross-examination, the Department asked whether attorney Miller filed a power of attorney with the Department indicating that he represented taxpayers personally. Attorney Miller could not recall whether he filed a power of attorney on behalf of taxpayers. The Department further inquired as to whether or not attorney Miller knew that the original proceeding commenced in December of 1986 and was continued when taxpayers fired their original attorney. He acknowledged this fact. On redirect, attorney Miller stated that he informed the Department that he was representing taxpayers individually and that his practice was to leave his business card with the Department.

Khalil testified that he, his brother Farid and Jet Foods were represented by the firm of Burke & Smith and that attorney Miller was the attorney who handled the matters that arose before the Department on their behalf. He further testified that a conference was held in the spring of 1987 where attorney Miller represented him and his brother. Khalil testified that the issue discussed at the meeting was whether or not he and his brother Farid should be personally liable in the Jet Foods matter. Khalil testified that the outcome of the hearing was that he and Farid would not be personally liable for Jet Foods' tax liability. He also testified that he and Farid celebrated following this hearing.

Khalil testified that he was contacted by a Department collection agent in 1990. He told the agent that he was represented by Burke & Smith and that it surprised him that he was being contacted about this tax matter because he believed that it had been resolved. Khalil denied ever receiving an NPL from the Department and testified that he moved in July 1989 and notified the post office of his forwarding address.

Farid testified that he, his brother and Jet Foods were represented by Burke & Smith in 1987. Farid indicated that he moved from Illinois to Arizona due to health problems in 1989. Farid denied ever receiving an NPL from the department. Farid

7

stated he, his brother and attorney Miller attended a meeting in the spring of 1987, a few months before the Jet Foods hearing on June 4, 1987. Farid testified that the purpose of the meeting was to determine if he and Khalil would be personally responsible for the tax liability in the Jet Foods matter. He told the ALJ, "After we finished meeting I asked the judge, 'What can I do now?' She said 'Go and live your life. Congratulations, nothing against you.' Then I went outside, told my brother what's happening, we celebrate [sic] and went home." Subsequently, the following colloquy occurred between Farid and his attorney:

"MR. SMITH: Q. Did Rick Miller continue to represent Jet Foods at the hearing in June?

A. I remember he said about two months I'm going to leave, and Mr. Burke & Smith going [sic] to represent me and my brother, too.

Q. And when did you first have anything to do with Burke & Smith, to the best of your memory?

A. It's about - - when did we start with Burke & Smith, do you mean [sic]?

Q. Yes. Was it '86 or '87? When was it approximately?

A. Before '86.

A. Did they have power of attorney? Did Burke & Smith have power of attorney on your behalf with the Department of

8

Revenue?

A. Yes, sir.

Q. Around that time?

A. Yes, sir.

Q. And so in addition to Mr. Miller representing you individually on that date, Burke & Smith had a power of attorney on file at that time too, in the spring of 1987; is that right?

A. Yes, sir."

On cross-examination, the Department asked Farid if he had copies of the powers of attorney that he testified were filed on his behalf by the firms of Barnstein & Berman and Burke & Smith. Farid testified that he did not and that all documents were filed with the Department by his attorneys. Farid further testified that he did not notify the Department of his move to Arizona, but that he informed his attorneys at Burke & Smith. He also testified that he lost his driver's license in 1989 and had to apply for a new license in Illinois in order to receive a driver's license in Arizona. He used his former Illinois address to obtain a new license though he no longer lived in Illinois.

Taxpayers called attorney Wickert who testified that he was an attorney for the law firm of Burke & Smith from 1984 until 1992. He testified that during the late 1980s Burke & Smith

represented taxpayers and Jet Foods and he was assigned to do work on the case as an associate. Attorney Wickert testified that he filed a power of attorney on behalf of Jet Foods at Farid's direction relative to an income tax matter on October 31, 1989.

Taxpayers then called Carol Harper, a public service administrator for the Department in the 100% penalty unit. Harper testified that the Department attempts to notify and collect payment from the responsible taxpayer, in this case Jet Foods. If efforts are unsuccessful, the collections bureau attempts to collect the debt from the responsible taxpayer. Once it is determined that collection from the responsible taxpayer is not possible, the matter will be referred to the 100% penalty unit. Harper testified that the unit will issue NPL's to the responsible officers. Harper also explained the methods used to obtain information about responsible officers including checking tax returns, filings with the Secretary of State and checks issued to the Department for taxes.

Harper also testified that she was asked by counsel to check the Jet Foods files. She ordered the Jet Foods files and learned that the audit file had been destroyed and the general file had been "purged" or, according to Harper, nothing was in the file. In this case Harper testified that she relied on filings from the

Illinois Secretary of State.  Harper further testified that had she received the NPL that was returned with a forwarding address that she would resend the NPL out of fairness and reasonableness. She did, however, acknowledge on cross-examination that she was not required to do so under any policy or regulations in place within the Department.

Throughout the hearing, the Department objected to any mention of a hearing that took place in the spring of 1987 contending that no procedure existed in the regulations that allowed for such a hearing.  The parties do not dispute that the spring 1987 hearing took place before the June 4, 1987 disposition of Jet Foods' liability.  The Department asserted that a determination of individual liability of corporate officers could not be made until the liability of the corporation was established.  The Department, however,  presented no testimony or evidence that negated a meeting with the Department, taxpayers, attorney Miller from Burke & Smith as taxpayers' personal attorney and an ALJ during which taxpayers were made aware of their potential liability for Jet Foods' tax liability.

Following the hearing after the circuit court's first remand and further briefing by the parties, the ALJ ruled that taxpayers were required to file a power of attorney with the Department pursuant to Sweis v. Sweet, 269 Ill. App. 3d 1 (1995); taxpayers

11

could not produce a copy of the power of attorney; testimony offered by attorney Miller and taxpayers was not credible; section 200.110 of the Department's regulations prohibits anyone from appearing on behalf of a taxpayer without first filing a power of attorney relative to the particular matter; and even if the meeting took place, initial contact occurred when the NPL was sent because corporate liability must be determined first and corporate officers' liability cannot be intermingled with corporate liability.

Taxpayers appealed this ruling and the matter was fully briefed before the circuit court. The circuit court held that the ALJ erred in excluding the testimony of attorney Miller concerning the hearing alleged to have taken place in the spring of 1987; his testimony was relevant and should have been considered by the ALJ in determining whether the Department had complied with section 12 of the Act. The court ordered the matter remanded a second time to the Department's board of appeals and that the testimony of attorney Miller be admitted into evidence. The ALJ was instructed to review the testimony of attorney Miller and the rest of the record to determine whether taxpayers were personally represented by Burke & Smith at the time of the 1987 meeting and whether this meeting or any other contact by the Department occurred prior to the issuance of the

1-05-0157

NPL's during which taxpayers were made aware of their potential for individual liability within the meaning of <u>Sweis</u>. The Department was given leave of court to present evidence or testimony to rebut the testimony of attorney Miller.

On the second remand, the Department indicated to the ALJ that it would not call any witnesses or seek to admit any evidence. The Department explained to the court that:

"The ALJ in that particular case to our best understanding is a federal administrative law judge, and the department did not think it was appropriate policy to go about calling federal officers, judges, indirectly as witnesses in departmental hearings.

We don't believe that that's an appropriate role for a federal judge or an appropriate role for a federal ALJ nor is it an appropriate role for a department ALJ to become a witness. Nor do we feel that we want to expose in the future our litigating attorneys to becoming potential witnesses about conversations or things that happened within the scope of hearings.

So for that reason, from a policy prospective, we didn't think that was an appropriate way to go.

As it turns out, the ALJ in that case is Valerie Bablick (phonetic), and it is also our understanding that she is in

13

either Kentucky or West Virginia and may have been difficult to find and would have been more difficult to subpoena if she didn't want to come. But we didn't really want to get into that kind of an issue."

The Department continued to argue that no procedural mechanism existed for a hearing or meeting to discuss personal liability of a responsible officer prior to a disposition in the underlying corporate liability case. The Department asked the ALJ to take judicial notice that no regulations or statutes exist that permit such a proceeding.

On August 8, 2001, the ALJ ruled that the Department was not legally required to mail the NPL's to taxpayers' attorneys. The ALJ based her conclusion on the fact that taxpayers could not produce a copy of a power of attorney filed with the Department on their behalf; attorney Miller's testimony was contradicted by an affidavit filed in the circuit court in 1996 by Farid wherein he indicated that the hearing at issue occurred in 1988 as opposed to 1987; taxpayers could not be joined in the Department's case against Jet Foods because the corporation must be found liable first and "you simply cannot combine a cause of action that does not yet exist and over which an ALJ has no authority with a pending action on another issue" (Emphasis in original.); and attorney Miller's testimony regarding the unusual

14

proceeding was indicative of his "ignorance with regards to the mechanics of the issuance and finalization of *** notices and their interrelation and serves to undermine the credibility of his testimony and his rendition of the events." Taxpayers appealed this ruling to the circuit court.

On December 22, 2004, the circuit court issued an order confirming the board of appeals' August 8, 2001 decision. The circuit court, however, specifically found that the ALJ's finding that attorney Miller's testimony was not credible and not entitled to any weight was against the manifest weight of the evidence. The court, in a 28-page written order, wrote the following relative to attorney Miller's testimony:

"Although the events in Miller's testimony occurred more than twelve years before his testimony, Miller testified that in anticipation of being a witness in this case, he went through his files of the case he handled at Burke & Smith in 1987. After he left Burke & Smith in August 1987, he did not work for the Sweilems and, therefore, these events had to occur before August 1987. The most important self-corroborating factor of Miller's testimony is the minute details he related concerning what happened before and at this spring 1987 meeting. Miller's testimony cannot be the result of a faulty memory or an unfamiliarity with

procedures.

If Miller's testimony is not true, he is guilty of perjury. Everything in Miller's career belies such a conclusion. Miller, who has gone on to a completely new position, had no incentive to lie as an officer of this Court on behalf of the Sweilems. Miller never spoke with the Sweilems from August of 1987 until moments before his testimony in 1999. Yet we see the similarities in their statements: (1) Farid said in the affidavit there was a meeting that he attended at the State of Illinois Building between the Attorneys for [sic] Burke & Smith and the Department; and (2) Farid says in an affidavit that he was told by the Department it would not pursue him as an individual for the tax liability of Jet Foods. Miller's testimony is uncontradictory.

The only differences present are: (1) Farid says in the affidavit that the meeting occurred in April of 1988 while Miler says that it occurred one year earlier. We know that Miller is correct because he left Burke & Smith in August of 1987. It is likely that in 1996 when Farid filed this affidavit, he forgot the meeting was in April of 1987 instead of April of 1988. Farid's memory of an April meeting corroborates Miller's testimony that the meeting

16

occurred in the months before June of 1987; and (2) Farid, in an affidavit prepared by his attorneys, Burke, Burns & Pinelli in 1996, said he was told by the Department at this meeting that there would be no individual liability because there was no finding of fraud against Jet Foods. The Burke firm did not interview Miller prior to filing the 1996 affidavit. Miller testified that at the spring 1987 meeting he convinced the ALJ the Sweilems should not be held individually responsible and the ALJ so informed the Sweilems. This was corroborated by the Sweilems testimony.

The Department presented no testimony or evidence that negated a meeting at the State of Illinois Building among the Department, the Sweilems and Burke & Smith at which the Sweilems, with Burke & Smith as their attorneys, were made aware of their potential individual liability for Jet Foods' taxes." (Emphasis added).

The circuit court, notwithstanding its finding, held that the hearing could not have been an "initial contact" because there had been no determination that Jet Foods was liable for the taxes owed, there was no power of attorney on file and there was no previous proceedings commenced against taxpayers individually. The court held that the potential for individual liability that was the basis for the court's decision in Sweis was not present

17

in this case, and the ALJ's ultimate finding that the Department's initial contact was not at the spring 1987 meeting was not against the manifest weight of the evidence. Taxpayers filed the instant appeal.

## ANALYSIS

### I. STANDARD OF REVIEW

Despite the fact that the parties collectively identify 12 issues on appeal which they contend must be answered by this court, we are of the view that the central question is whether there was an initial contact made by the Department prior to issuance of the NPL's to taxpayers. In order to answer this question, we must resolve both questions of fact and law. "As a preliminary matter, we note that this court reviews the administrative agency's decision and not the circuit court's decision." Wigginton v. White, 364 Ill. App. 3d 900, 905 (2006), citing Lindsey v. Board of Education, 354 Ill. App. 3d 971, 978 (2004). The standard of review applied to an administrative agency's decision depends upon whether the issue presented is one of fact or one of law. Carpetland U.S.A., Inc. v. Illinois Department of Employment Security, 201 Ill. 2d 351, 369 (2002). An administrative agency's factual findings are reviewed by applying a manifest weight of the evidence standard. Lindsey, 354 Ill. App. 3d at 978. An administrative agency's legal

conclusions, on the other hand, are reviewed <u>de</u> <u>novo</u>.  <u>Lindsey</u>, 354 Ill. App. 3d at 979.

The framework for deciding whether the Department made an initial contact with taxpayers pursuant to section 12 of the Act requires two analyses.  First we must decide whether it was permissible for the ALJ to disregard attorney Miller's and taxpayers' unrebutted testimony that a proceeding took place during which they were informed of their potential future tax liability.  If not, we must then determine whether the proceeding was sufficient to constitute an initial contact pursuant to <u>Sweis</u> <u>v. Sweet</u>, 269 Ill. App. 3d 1 (1995).

## II. UNREBUTTED TESTIMONY

Because we have previously recounted the facts, we need not revisit the evidence again in detail which the circuit court relied upon.  We agree with the circuit court's conclusion that the Department failed to produce any evidence to rebut taxpayers' assertion that a proceeding took place during which they were informed of their potential responsibility for future tax liability.

Our supreme court has clearly indicated that in Illinois a finder of fact may not simply reject unrebutted testimony. <u>Bucktown Partners v. Johnson</u>, 119 Ill. App. 3d 346, 353-55 (1983), citing <u>People ex rel. Brown v. Baker</u>, 88 Ill. 2d 81, 85

19

1-05-0157

(1981); Bazydlo v. Volant, 164 Ill. 2d 207, 215 (1995). As the Illinois Supreme Court has explained, although "the credibility of witnesses and the weight to be accorded their testimony are typically jury considerations [citations], a jury cannot arbitrarily or capriciously reject the testimony of an unimpeached witness [citations]." People ex. rel. Brown, 88 Ill. 2d at 85. This is true even though the witness may be an interested party or an employee of one of the parties. Chicago & Alton R.R. Co. v. Gretzner, 46 Ill. 74, 80 (1867); Bucktown Partners v. Johnson, 119 Ill. App. 3d at 352.

Under the standards announced in Bucktown Partners and People ex rel. Brown, a fact finder may not discount witness testimony unless it was impeached, contradicted by positive testimony or by circumstances, or found to be inherently improbable. Bucktown Partners, 119 Ill. App. 3d at 353, citing People ex rel. Brown, 88 Ill. 2d at 85. "Under Illinois law, a witness' testimony is inherently improbable if it is 'contradictory of the laws of nature or universal human experience, so as to be incredible and beyond the limits of human belief, or if facts stated by the witness demonstrate the falsity of the testimony.' " Bucktown Partners, 119 Ill. App. 3d at 354, quoting Kelly v. Jones, 290 Ill. 375, 378 (1919).

In our view, it is not inherently improbable that the

20

1-05-0157

Department attempted to join or pursue taxpayers individually. It is conceivable that the Department attempted to hold taxpayers responsible in the suit against Jet Foods especially since the corporation had been dissolved and was insolvent prior to the June 4, 1987 hearing. The fact that the Department regulations do not provide a specific framework for such a procedure neither renders the corroborated testimony of three witnesses inherently improbable nor conclusively proves that it could not occur.

Taxpayers produced evidence that following the commencement of the Jet Foods tax matter they received a summons to appear before an ALJ. At this proceeding, they were represented by their attorney who argued on their behalf explaining why they should not be personally liable for the Jet Foods tax liability. In our view, it is more likely that the Department, in its thorough and zealous representation of the state, unsuccessfully attempted to hold taxpayers responsible for the tax liability of the bankrupt corporation prior to the completion of the Jet Foods tax liability determination. It is less likely that three witnesses, one of whom is entirely independent, would fabricate corroborative testimony of an event that took place more than 10 years ago without speaking to each other in over 12 years. Consequently, we find that it was not incredible testimony beyond the limits of human belief that is contrary to the laws of nature

21

or human experience.  Bucktown Partners, 119 Ill. App. 3d at 354.

The fact that no supporting documents were produced such as the summons or a power of attorney does not persuade this court that the proceeding did not occur.  Nor is it proof by circumstances that refutes taxpayers' evidence.  We point out that the Department destroyed the audit file while this matter was still pending before the Department's appeals board and the circuit court.  The master file also was purged of all information prior to the hearing ordered by the circuit court on its first remand.  Moreover, the Department had the opportunity to rebut the testimonial evidence offered by taxpayers by calling the ALJ who allegedly presided over the meeting at issue.

The Department argues that taxpayers had the same opportunity to call the ALJ who presided over the spring 1987 proceeding and should have done so to prove their case.  We reject this argument for two reasons.  First, taxpayers produced more than sufficient evidence that the proceeding occurred in the form of unrebutted testimony from three witnesses.  Second, after taxpayers produced the only evidence during the first hearing on remand, the circuit court ordered a limited remand a second time specifically indicating that only the Department was granted leave to call additional witnesses or admit evidence.  The Department, without explanation, simply stated that it was

22

improper, in its view, to call a former ALJ or seek to obtain an affidavit to rebut taxpayers' evidence and chose to stand on its theory that it could not have happened because no statutory mechanism existed to facilitate it.

When assessing the hearing officer's fact determinations, we apply a manifest weight of the evidence standard of review. Wigginton, 364 Ill. App. 3d 900, 911 (2006), citing Lindsey, 354 Ill. App. 3d at 978. However, in the absence of any evidence contradicting taxpayer's testimony or a showing that it is inherently improbable pursuant to Bucktown Partners, 119 Ill. App. 3d at 353-55, and People ex rel. Brown v. Baker, 88 Ill. 2d at 85, we find that an ALJ cannot reject the evidence under any standard of review. Wigginton, 364 Ill. App. 3d at 911. We thus hold that the ALJ erred in rejecting the testimony of attorney Miller, Farid and Khalil and the unrebutted evidence must be taken as true.

### III. INITIAL CONTACT

Taxpayers contend that the NPL's were ineffective because they were sent directly to them instead of to their attorneys pursuant to section 12 of the Act because the spring of 1987 proceeding was an initial contact. The Department argues that pursuant to section 12 of the Act and the Sweis case, it is only required to send NPL's to a representative of a taxpayer after

1-05-0157

(1) an initial contact has been made; and (2) when a taxpayer has a power of attorney on file with the department. Both the circuit court and the Department ruled that personal liability is not possible until the hearing on the corporation's tax liability is completed. We disagree.

Section 12 of the Act states: "Following the initial contact of a person represented by an attorney, the Department shall not contact the person concerned but shall only contact the attorney representing the person concerned. Ill. Rev. Stat. 1989, ch. 120, par. 451.

The purpose of the Act is to collect a tax and, as a result, the rights and liabilities of the parties accrue at the time the tax becomes due and owing, even though the exact amount of the taxes may not have yet been determined. Sweis, 269 Ill. App. 3d at 6. In the instant case, the taxes at issue became due in 1978, 1979, 1980 and 1981. Jet Foods' tax liability was set at that time and the Department was entitled to payment of the tax, and any officers or employees' potential future liability sprung to life. Sweis, 269 Ill. App. 3d at 6. We also noted that "[s]ection 13 1/2 clearly designates that personal liability 'represents the tax unpaid by the corporation,' and this corporate tax is the sole 'basis of such penalty liability.' The exact amount of liability is based on either (1) the final or

24

revised final assessment, or (2) the corporate taxpayer's return filed with the Department." Sweis, 269 Ill. App. 3d at 6.

The Act, as we pointed out in Sweis, gives the Department three methods to collect taxes where a corporation has not timely and/or accurately paid its taxes: (1) collect the unpaid amount from the corporate taxpayer; (2) institute criminal proceedings against the corporate taxpayer and/or responsible officers and employees; and (3) collect the unpaid amount from the responsible officers or employees under section 13 1/2. Although these alternatives may encompass separate proceedings, they are nonetheless connected and dependent upon the unpaid corporate taxes. Sweis, 269 Ill. App. 3d at 7. Due to the interconnected nature of these proceedings we characterized them as "different spokes of the same wheel," and found that "initial contact occurs when the Department for the first time advises or notifies an officer or employee that he or she may be potentially liable for any unpaid taxes of the corporation." Sweis, 269 Ill. App. 3d at 7. Based on the testimony of attorney Miller, Farid and Khalil that the Department communicated its intent to hold Khalil and Farid personally responsible for Jet Foods' deficiency, we hold that the initial contact occurred in the spring of 1987.

We also find that the protections of section 12 do not depend exclusively upon the execution of a valid power of

25

attorney. In our view, it is important to accentuate the fact that, contrary to the Department's assertion, neither the Sweis case nor section 12 of the Act requires a taxpayer to submit a power of attorney as a prerequisite to receiving the protections contemplated therein. The statute and the Sweis case require the protections at issue here following an initial contact. Sweis 269 Ill. App. 3d at 9. Simply put, the Department cannot limit the protections created by the legislature by reading requirements into the statute which do not exist. Undoubtedly, the fact that the taxpayer in Sweis previously submitted a valid power of attorney for the relevant period and matter was particularly damning to the Department's position in there. Sweis, 269 Ill. App. 3d at 9, citing Pape v. Department of Revenue, 40 Ill. 2d 442, 452 (1968) (holding that section 12 of the Act required the Department to rely on the information in its files and a valid power of attorney which the taxpayer had previously executed). In our view, the production of a power of attorney for the relevant time and matter in Sweis was conclusive, but not necessarily requisite proof.

In the instant case, however, the only testimony presented relative to this issue was that taxpayers received a notice to appear on a certain day in the State of Illinois Building, they appeared represented by counsel, who had previously represented

26

Jet Foods in various other matters with the Department and, according to Farid's unrebutted testimony, filed a power of attorney with the Department. Moreover, we will not presume, in the Department's favor, that a power of attorney never existed when it destroyed the files and documents that would serve as evidence to support or refute the claim.

Additionally, we emphasized in Sweis the protective nature of section 12 of the Act:

"Prior to 1975, section 12 allowed the Department to contact and send notices merely to the 'person concerned.' However, in an effort to provide greater protection for individuals and to ensure that their rights were safeguarded and preserved, Senate Bill 55 was introduced. The debates surrounding this bill clearly indicate that the legislature intended to give greater protection to taxpayers and others concerned against the government's imposition and collection of this tax. (See 79th Ill. Gen. Assem., House Proceedings, June 9, 1975, at 11; June 11, 1975, at 104-06; November 20, 1975, at 72-79; November 21, 1975, at 136-48; Senate Proceedings, June 20, 1975, at 73; November 5, 1975, at 12-16.) ***. [Relative to] the language pertinent here[,] Senator Nudelman stated: '[T]he amendment to Senate Bill 55, requires only that once there has been a proceeding started

27

that the department have contact with \*\*\* the respondent's lawyer, if in fact he has a lawyer who has filed an appearance.' (79th Ill. Gen. Assem., Senate Proceedings, June 20, 1975, at 73.) The debate in the House is more enlightening. \*\*\*.

'Madison: Representative Kosinski, ah \*\*\* it seems like in the discussion on this Bill an aspect of this Bill has been left out which seems to me to be very important. As I understand it, this Bill also prohibits the Department of Revenue from contacting a person represented by an attorney except from the initial contact. Is that not true?

\* \* \*

Kosinski: You're understanding, Mr. Madison, is perfectly correct. This was in the form of an Amendment offered by Representative Berman on the premise that once the taxpayer is contacted by the Department of Revenue and has the good judgment to turn this over to a competent attorney, in the future, the Department would then deal through the attorney so that the taxpayer is properly represented and the answers are correct. You're right, Mr. Madison.

Madison: Ah \*\*\* What is your reaction to the argument, Representative Kosinski, that this procedure interferes with

28

the individual[']s rights of being informed of the status of a suit or hearing?

Kosinski: Ah *** I have a negative reaction to that statement in that the taxpayer is originally contacted. His rights are told him. He knows the subject of the case. He knows the problems of the case and only after that and after consideration of thought does he turn it over to a tax ah *** attorney to represent him, and I think that man is most fitted properly to represent the taxpayer.' (79th Ill. Gen. Assem., House Proceedings, November 20, 1975, at 75-76.) This exchange confirms that the legislature intended, in amending section 12, to protect individuals from such disastrous results as occurred in this case. Although the legislature did not explicitly discuss what it meant by initial contact, the legislature did not limit it to initial contact per notice or proceeding." (Emphasis added.) Sweis, 269 Ill. App. 3d at 8-9.

It is clear from the plain language of section 12 of the Act and its legislative history that the intention of the legislature was to protect the taxpayer from technically defaulting in a matter with potentially catastrophic financial implications. Indeed, in this case where taxpayers defaulted for failure to

respond within 20 days, the initial tax liability exclusive of penalties and interest which amounted to less than $150,000 grew exponentially to nearly $1 million. This is an amount that the Department seeks to recover from taxpayers without the benefit of a hearing on whether the individuals are legally responsible for the corporation's deficiency. Based on the unrebutted evidence of a proceeding held in the spring of 1987 where taxpayers were represented by counsel and informed of their potential liability for Jet Foods' tax, we hold that the Department made an initial contact with taxpayers within the meaning of section 12 of the Act and Sweis. The Department, as a result, violated section 12 of the Act by not mailing the NPL's to taxpayers' attorneys. Thus, the NPL's did not become final and taxpayers have not waived their rights to contest them. Sweis, 269 Ill. App. 3d at 5.

## IV. CONCLUSION

For the foregoing reasons, we hold that the ALJ was not entitled to disregard the unrebutted testimony presented by taxpayers; the proceeding to which taxpayers and attorney Miller testified was an initial contact as contemplated by section 12 of the Act and Sweis, 269 Ill. App. 3d at 6; the Department violated section 12 of the Act by failing to mail the NPL's to taxpayers' attorneys and taxpayers have not waived their right to contest

the NPL's.  Because this matter is remanded for further proceedings, we need not address taxpayers' due process claims. Accordingly, the judgment of the circuit court is reversed and this matter is remanded to the Department's board of appeals for further proceedings consistent with this opinion.

Reversed and remanded with directions.

JOSEPH GORDON and McNULTY, JJ., concur.