2020 IL App (1st) 190931-U

No. 1-19-0931

Order filed September 17, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| RICHARD VITIRITTI, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Illinois |
| | ) | Human Rights Commission |
| v. | ) | |
| | ) | |
| KHB GROUP, LLC d/b/a | ) | Charge No. 2011 CA 2517 |
| MIDWEST MECHANICAL GROUP, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the decision of the Human Rights Commission when it applied the appropriate standard in evaluating petitioner's age discrimination claim, its findings of fact were not against the manifest weight of the evidence, and it did not err in finding that respondent articulated legitimate, nondiscriminatory reasons for certain adverse employment actions.

¶ 2   Petitioner Richard Vitiritti appeals from a final decision of the Human Rights Commission

(Commission), adopting the recommended decision of an administrative law judge (ALJ) on his

charge of age discrimination by respondent, KHB Group, LLC d/b/a Midwest Mechanical Group.[1] Specifically, the Commission found that respondent discriminated against petitioner on the basis of age when it removed him from an account at a client's request, in violation of the Illinois Human Rights (Act) (775 ILCS 5/1-101 *et seq.* (West 2010)). However, the Commission rejected petitioner's claims that respondent changed his compensation, stopped approving his sales, and constructively discharged him based on his age.

¶ 3    On appeal, petitioner contends that the Commission applied the wrong legal standard when evaluating his claims, and erred when it found that he was not discriminated against where (1) his compensation was changed to commission only, (2) respondent stopped approving his sales, and (3) he was constructively discharged. Petitioner also contends that the Commission erred when it denied him damages arising out of his constructive discharge and the "bulk" of his attorney fees. We affirm.

¶ 4    On February 28, 2011, petitioner filed a charge with the Department of Human Rights and Equal Employment Opportunity Commission alleging his employer, respondent, unlawfully discriminated against him based on his age. In particular, petitioner alleged that on September 2, 2010, respondent acquiesced to client Pepper Construction's demand for a younger sales representative. Thereafter, on November 29, 2010, petitioner's compensation changed from salary plus commission to only commission with no advanced draw. In its answer, respondent denied the allegations and stated that petitioner's compensation was changed due to underperformance. As

---

[1] In this order, we adopt the caption used in petitioner's petition for review filed in this court on May 6, 2019. The named respondent, however, has not filed an appearance. Rather, an appearance and response brief have been filed by the Human Rights Commission and the Department of Human Rights.

petitioner's complaint was not adjudicated within one year, he filed a complaint with the Commission on March 2, 2012.

¶ 5    On August 4, 2014, respondent filed a motion for summary decision alleging that petitioner could not satisfy the *prima facie* elements of an age discrimination claim, rebut the legitimate reasons for respondent's actions, or show that respondent's actions were pretextual. The ALJ denied respondent's motion and the matter proceeded to a hearing.

¶ 6    Petitioner testified that he was born in 1947 and had 45 years of experience in the heating, ventilating, and air conditioning industry. His success depended on his relationships with clients and understanding their needs. A client would explain a project to petitioner, and he would confer with the engineering and estimating departments to determine a "list" price. "[E]stimating" involved collecting quotes for labor and supplies, applying overhead, and determining cost so that a price could be presented to a client. He rarely took part in determining prices, but was "expected to bring the order back" to respondent.

¶ 7    In July 2006, petitioner began working for respondent. In 2006, he had $3.5 million in sales and from January to October 2007, he had $5.5 million in sales. In October 2007, petitioner took a position with Pepper Construction. After Pepper Construction laid him off in 2009, he was approached by respondent's sales manager, John Hiller, and accepted a position as a project engineer with a $75,000 annual base salary. His additional compensation was 25% of one-half of respondent's net profit on a project, and he received a "weekly guarantee" against his commissions. Between 2009 and 2010, his successful sales included projects at the Apple Store ($1.5 million), Union Station ($500,000), and Good Samaritan Hospital ($2.5 million). He also sold smaller projects totaling between $300,000 and $400,000.

¶ 8    In 2007, petitioner was entitled, per his contract with respondent, to request future commissions and he received $110,000 when he left respondent's employ. However, in 2009, after he was rehired by respondent, Ken Beard, respondent's president, told him that certain jobs "went south" and he owed respondent $110,000. Petitioner was expected to make sales to cover this " 'back charge.' " When petitioner questioned Hiller about the discrepancy, he was told that several jobs brought in by John Brooks, the head of estimating, were taken at a "lower sold price" and needed to be covered.

¶ 9    On August 26, 2010, Beard told petitioner that Pepper Construction wanted him replaced with "someone younger" and instructed him to take Greg Biziarek, who assumed the sales account for Pepper Construction's Division 32, to Pepper Construction for introductions. Otherwise, petitioner could "pack up and leave." Later, a Pepper Construction employee asked petitioner to do something because Biziarek was not "doing the job."

¶ 10    In November 2010, respondent gave petitioner a new contract that reduced his commission draw to zero, making him "negative" once he paid for benefits. Under his original contract, petitioner explained that the lowest annual amount he could earn would be $75,000, but he expected to earn between $100,000 and $150,000 based on commissions. None of petitioner's sales were being approved and he felt as though he had been discharged. As a result, petitioner and his wife lost their home and moved to Florida, and his wife became a "total alcoholic" and "blam[ed] it on [him]." Six months later, after petitioner mailed 100 resumes, a company hired him as a project engineer with a $40,000 annual salary. After another six months, he moved to a different position as a traveling engineer with an $85,000 annual salary.

¶ 11    Regarding his claim that respondent "cook[ed] the books" to underpay him, petitioner explained this meant transferring costs from one project to another. By reducing the profit margin for petitioner's projects and increasing it for other projects, respondent would diminish petitioner's compensation and make it appear as if he had done a "bad job." He first suspected something in 2006, after a project at the Baha'i Temple ended but invoices were still being charged against it.

¶ 12    During cross-examination by respondent's attorney, petitioner acknowledged signing a release of claims when he left respondent in 2007 in exchange for a $115,000 payout. Petitioner admitted that he had no documents to support his claim that when he returned to respondent's employ he was told this amount would be a back charge against his commission reserve. He returned as a project engineer, someone who both supported and made sales. The Apple Store and Union Station projects "closed" in late 2010. He booked the Good Samaritan Hospital project in 2009 and was paid via a draw against commission, but could not "comment" as to whether he received the final commission or if that job closed.

¶ 13    At the end of 2009, a Pepper Construction employee told petitioner that "ownership" said he would not be allowed to bid on a project. After August 2010, petitioner was not "calling" on Pepper Construction's Division 32, but the administrative director wanted him back. After respondent converted petitioner's salary to only commission, he earned no money because the amount he owed respondent had increased and his "commission reserve [was] a negative value."

¶ 14    Petitioner was originally hired under a salary plus commission plan, but he denied there was a $4.5 million annual sales plan or that an annual sales plan was communicated to him. He received a monthly sales report and was "consistently" on plan between February 2009 and November 2010. Petitioner and Beard discussed his sales performance every Monday morning.

Petitioner explained that these discussions were not "necessarily" about underperformance; rather "they would try to understand was it the economy, was it the estimates, or was it poor salesmanship." Beard never expressed that petitioner's performance reflected "poor salesmanship"; rather, it was "always the economy and what was going on and how we could make it better." There was a "slump because of 2008," and the Monday morning meetings were Beard's chance to talk to each salesperson and understand what he could do to improve sales. The "tone" of these meetings was that everyone needed to make more sales.

¶ 15     Between February 2009 and November 2010, petitioner sold three projects totaling $1,818,485. These generated a gross margin loss of $18,738. After spring 2010, he only sold $3950 in bookings. Although petitioner did not know how Biziarek was compensated, Biziarek's "pipeline" in October 2010 suggested a sales-based performance plan.

¶ 16     Petitioner explained that the estimating department, under the direction of Brooks and possibly a sales manager, would set the minimum price that respondent would accept on a project. When a bid was submitted, there was no way to know if respondent was the lowest bidder. In some cases, respondent could not meet the client's demand for a lower price, and in other cases, respondent might take a job to create overhead to cover costs and petitioner would negotiate his commission separately. During 2009 and 2010, Brooks, whose job was to determine whether projects would be profitable, rejected petitioner's proposals. Petitioner specifically asked Brooks why one job, the Kluczynski building project, was rejected, but Brooks had no explanation. When petitioner asked Hiller why the project was rejected, Hiller said respondent needed the sale and he could not understand why the project was not "brought in."

¶ 17    On November 29, 2010, respondent converted petitioner to only commission-based compensation. During a meeting with John Caraher, respondent's president, petitioner was told that the change was "company-wide." Petitioner denied that his underperformance was a factor in his changed compensation; rather, to the best of his recollection, Caraher said that the "entire company was suffering," that respondent's structure was being changed, and "that this had to be done to save the company." Caraher "did not say anything about [petitioner's] age." After November 30, 2010, petitioner was not in the office; rather, he was "beating the streets." Although he believed that zero compensation was equivalent to termination, he would have earned money if his projects were approved. He believed he was terminated because his compensation was changed to solely commission, and calculated his lost commissions as "plus a million bucks." When he told Brooks that he was not being credited the proper amount, Brooks "read [him] the riot act."

¶ 18    During re-cross, petitioner testified that Biziarek was not involved in sales before replacing petitioner on the Pepper Construction account. Petitioner never sold at "list price" because the market was too competitive. When he spoke to Hiller about the profit margins on his projects being "cooked," Hiller said other salespeople were experiencing the same thing. At a "major meeting" when no one could explain why salespeople were losing commissions, it almost got "physical."

¶ 19    John Reints, respondent's executive vice president and general manager from 2004 until 2008, testified that he hired petitioner twice at other companies because he was "an extremely good engineer." He also knew Biziarek, who was a drafting engineer without sales experience, and never would have replaced petitioner with Biziarek. In 2008, Reints did most of the hiring for respondent and hired people who could engineer first. Beard, on the other hand, hired young and

inexperienced salespeople. During cross-examination, Reints testified that he left respondent's employ 2008 and had no firsthand knowledge of petitioner's employment between 2009 and 2010.

¶ 20   Respondent moved for a directed finding, arguing that petitioner testified that he believed he was terminated because his compensation changed. The ALJ denied the motion.

¶ 21   Caraher testified that he was respondent's chief financial officer and then president between February 2004 and May 2012, when respondent ceased operations. Petitioner was employed by respondent three times. First, in the "middle 1990s" for one day, then between 2006 and 2007, and finally between 2009 and 2010. When petitioner left the second time, Caraher was concerned about paying his commissions because some projects were "too early" in the process. However, Reints was "adamant" that petitioner be paid, so they agreed that any shortfalls would be charged to Reints. Petitioner was not back charged when he returned to respondent because the amounts had been moved to "house accounts."

¶ 22   Petitioner was hired to generate new sales, with an annual sales plan of between $4 and $5 million. His "big selling point" was his strong relationships at Pepper Construction. Caraher prepared monthly sales and commission reports, but petitioner did not meet the annual sales plan. Respondent was not doing well in early 2010, so "dramatic" changes were made. Six people were terminated and salaries were reduced. All of respondent's sales engineers were over 40 years old, and three were converted solely to commission-based compensation. On November 29, 2010, petitioner's compensation was also changed to solely commission. Caraher testified that petitioner's age "had nothing to with" the change in compensation; rather, respondent could not continue with the "same cost structure."

¶ 23    Respondent "partner[ed]" Biziarek with petitioner to work on the Pepper Construction account. Biziarek was also assigned to sales engineer Bob Parks to obtain "more coverage" on his accounts. Biziarek was a project manager and did not replace petitioner. Although the estimating department determined the cost to build a project and set margins, in some situations, Caraher and Beard would make concessions to pursue a project. No one in the estimating department had the authority to reject a "profitable project." He was unaware of labor from other jobs being charged against petitioner's projects. Caraher last spoke to petitioner on November 29, 2010, and did not fire petitioner or say petitioner's employment was terminated.

¶ 24    During cross-examination, Caraher testified that Biziarek was directed to assist petitioner in cultivating the relationship with Pepper Construction. If petitioner's projects were not approved, he made no money. Caraher was never told that costs were improperly attributed to petitioner's jobs, but if he was made aware of "moving" costs or other unethical practices, he addressed them. During redirect, Caraher testified that assigning Biziarek to help petitioner did not affect petitioner's compensation or responsibilities. He thought petitioner was creative and a good salesperson. However, because of "the crash of 2008," sales engineers were unable to find work, which was "essentially" why respondent could not find the types of projects it had previously booked.

¶ 25    In rebuttal, petitioner testified that Biziarek said he did not need petitioner's help with Pepper Construction. Between March and August 2010, Brooks rejected three of petitioner's sales. Hiller, petitioner's direct supervisor, told him to do what Brooks said.

¶ 26    On January 12, 2018, the ALJ entered a recommended liability determination that petitioner proved, through direct evidence, that respondent discriminated against him on the basis

of age when it removed him from Pepper Construction's Division 32 account and replaced him with a younger colleague. The ALJ noted, however, that petitioner's "remaining claims cannot be established through direct evidence," and concluded that petitioner failed to establish a *prima facie* case of age discrimination with regard to his compensation agreement, the assignment of costs to his projects, or his departure from respondent's employ.[2] The ALJ determined that respondent articulated a legitimate, non-discriminatory reason for changing petitioner's compensation. Specifically, respondent switched its sales force to solely commission-based compensation because respondent's financial position "progressively weak[ened]," and petitioner failed to prove that this reason was a pretext for unlawful age discrimination. The ALJ stated that petitioner provided no documentation to support his claim that respondent wrongly attributed costs to his projects. As for the claim that respondent rejected projects in order to force petitioner from the company, the ALJ concluded that it "defied logic" to suggest that a company in financial difficulty would reject business in order to induce an employee to quit.

¶ 27    Regarding petitioner's claim that he was constructively discharged, the ALJ concluded that it was "clear" that respondent did not intend to discharge petitioner; rather, it wanted the business relationship to continue as evidenced by a new contract with updated compensation terms. The ALJ conceded that the new pay structure, through which petitioner's income was "nearly eliminated," might lead a reasonable person to conclude that he had to resign.  However, petitioner failed to establish that the change in compensation was because of his age. The ALJ noted that although petitioner proved one incident of age discrimination, his removal from the Pepper

---

[2] The ALJ noted that petitioner's complaint did not expressly allege constructive discharge or wrongdoing in the assignment of costs to his projects, but respondent elected to address both issues on the merits after they were raised at the hearing.

Construction Division 32 account, there was no other evidence of age discrimination in the record. Rather, all of respondent's sales engineers were over 40 years old and all were converted to commission-only compensation. The ALJ was not persuaded by petitioner's argument, based on one incident, that "every adverse action he encountered after the point was the result of age discrimination."

¶ 28    The ALJ recommended a $5000 award to petitioner for emotional distress due to the embarrassment of being removed from the Pepper Construction account and having to introduce his replacement. However, the ALJ did not recommend backpay because petitioner failed to establish that he lost any money due to his removal from Pepper Construction's Division 32 account, as he had no pending projects at that time.

¶ 29    In a July 30, 2018 order, the ALJ awarded petitioner's attorneys $36,329 out of the $89,822.50 sought based upon the partial success of petitioner's claims.

¶ 30    Petitioner filed exceptions, arguing that he testified that several profitable projects were rejected by respondent, he suffered emotional distress, and he was constructively discharged.

¶ 31    On April 3, 2019, the Commission declined further review, and held that the ALJ's recommended order and decision had become the order of the Commission. This order was served on the parties on April 10, 2019. On May 6, 2019, petitioner filed a petition for review before this court.

¶ 32    The Act provides that upon judicial review of a final order of the Commission, "the Commission's findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8-111(B)(2) (West 2010); see also *Koulegeorge v. State of Illinois Human Rights Comm'n*, 316 Ill. App. 3d 1079, 1087-88 (2000).

Whether the employer's articulated reason for discharging the employee is pretextual is a question of fact. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989).

¶ 33    Where an appellant raises an issue of law, our review is *de novo*. *Jones v. Lockard*, 2011 IL App (3d) 100535, ¶ 16. However, if the appellant raises an argument that involves a mixed question of law and fact, or application of law to the facts, we review for "clear error." *Id.* We may affirm the Commission's decision "on any basis appearing in the record, regardless of the actual findings and rulings of the agency." *Habinka v. Human Rights Comm'n*, 192 Ill. App. 3d 343, 372 (1989).

¶ 34    Initially, petitioner contends the Commission applied the wrong legal standard to his claims in violation of *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), when it separately analyzed direct and indirect evidence of discrimination rather than evaluating the evidence as a whole.

¶ 35    Whether the Commission applied the correct legal standard is a question of law that is reviewed *de novo*. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 327 Ill. App. 3d 768, 775 (2002).

¶ 36    In *Lau v. Abbott Laboratories,* 2019 IL App (2d) 180456, this court noted that it was guided by federal caselaw related to antidiscrimination statutes when interpreting the Act and cited *Ortiz* for the proposition that " '[e]vidence must be considered as a whole, rather than asking whether any particular [type or] piece of evidence proves the case by itself.' " *Id.* ¶¶ 38, 39 (quoting *Ortiz*, 834 F. 3d at 765).

¶ 37    In *Ortiz,* an employee claimed that his employer terminated him because of his Mexican ancestry. *Ortiz,* 834 F.3d at 761. He offered both direct and indirect evidence of discrimination, but

the district court granted summary judgment to the employer. *Id*. at 762-63. The district court determined that the employee failed to create a " 'convincing mosaic' " under either the direct or indirect method. *Id*. at 763.

¶ 38 On appeal, the Seventh Circuit determined that the district court erred when it failed to "aggregate the possibilities to find an overall likelihood of discrimination." *Id*. Additionally, the Seventh Circuit stated that the concept of a " 'convincing mosaic' " was not a legal standard. *Id*. at 765. Rather, the proper legal standard was "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id*. The court concluded that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id*.

¶ 39 In the case at bar, petitioner contends that the Commission violated *Ortiz* based on the reference to "direct" and "indirect" evidence in its order. We disagree. *Ortiz* did not hold that a factfinder cannot state whether a claim is proved by direct or indirect evidence, but rather that all evidence must be considered together. See *id*.

¶ 40 Here, as the Commission noted, the record shows one instance of direct evidence of discrimination, that is, petitioner's testimony that Beard stated that Pepper Construction wanted someone younger on the account and replaced petitioner with a younger employee. The Commission further noted that petitioner's "remaining claims cannot be established through direct evidence." In other words, petitioner produced no other direct evidence of discrimination, *i.e.*, no one stated that petitioner's compensation was changed, his sales were rejected, or he was

constructively discharged because of his age. We cannot agree with petitioner's conclusion that the Commission violated *Ortiz* simply by mentioning that only one of his claims was supported by direct evidence of age discrimination. Rather, the Commission examined the available evidence and correctly recognized that "all evidence belongs in a single pile and must be evaluated as a whole." *Id.* at 766. Hence, we find that the Commission applied the correct legal standard to petitioner's claims.

¶ 41 Turning to the merits of petitioner's claims, he contends that the Commission erred in finding that respondent did not discriminate against him based on age when it changed his compensation to commission only, stopped approving his sales, and constructively discharged him.

¶ 42 The Act prohibits unlawful discrimination against a person on the basis of, *inter alia,* age, sex, or disability. *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 916 (2010). To establish a *prima facie* case of employment discrimination, an employee must show that (1) he belongs to a protected class, (2) he met the employer's legitimate business expectations, (3) he suffered an adverse employment action, and (4) the employer treated others similarly situated outside the class more favorably. *Id.* at 919.

¶ 43 To show the third element, an adverse employment action, an employee must establish that the employment action was "materially adverse" and not a "mere inconvenience or an alteration of job responsibilities." (Internal quotation marks omitted.) *Id*. A materially adverse employment action is "one that significantly alters the terms and conditions of the employee's job." (Internal quotation marks omitted.) *Id.* For an employment action to be actionable, there must be a "significant change in employment status, such as hiring, firing, failing to promote, reassignment

with significantly different responsibility, or a decision causing a significant change in benefits." (Internal quotation marks omitted.) *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007).

¶ 44 Discrimination can be proved through direct evidence or indirectly through the three-prong test followed by federal courts to determine whether an employer has unlawfully discriminated against an employee. See, *e.g.*, *Lalvani v. Illinois Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001) ("a plaintiff *** may attempt to meet his burden by presenting direct evidence that race was a determining factor in the employment decision, or he may use the indirect method of proof for Title VII cases set forth in [federal cases]"). Direct evidence of age discrimination would be evidence that an employer made specific comments about an employee's age before an adverse employment action. *Illinois J. Livingston Co. v. Illinois Human Rights Comm'n*, 302 Ill. App. 3d 141, 152 (1998). When direct evidence is unavailable, indirect evidence may be used to sustain a case of intentional discrimination. *Sola v. Illinois Human Rights Comm'n*, 316 Ill. App. 3d 528, 536 (2000).

¶ 45 Under the indirect approach, an employee must first establish by a preponderance of the evidence a *prima facie* case of discrimination, *Owens*, 403 Ill. App. 3d at 919; see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This *prima facie* case creates a presumption that the employer engaged in unlawful discrimination. *Sola*, 316 Ill. App. 3d at 536. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its decision. *Owens*, 403 Ill. App. 3d at 919. "The employer has only the burden of production, not the burden of persuasion on this element." *Sola*, 316 Ill. App. 3d at 537. Once the employer has articulated a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the employee to establish by a preponderance of the evidence that the employer's reason was a pretext. *Id*. An

employee must therefore show that the articulated reason had no basis in fact, did not actually motivate the employer's decision, or was insufficient to motivate the employer's decision. *Id.* Under this test, the ultimate burden of persuasion rests with the employee. *Owens*, 403 Ill. App. 3d at 919. A final determination of unlawful discrimination must be established by, and supported with, a factual finding. *Illinois J. Livingston Co.*, 302 Ill. App. 3d at 153-54.

¶ 46    Here, it was undisputed that petitioner was over 40 years of age. Although petitioner testified that he met his sales goals, was never counseled about his performance, and any sales difficulties were due to the economy, he acknowledged that his sales between February 2009 and November 2010 generated a gross margin loss of $18,738. Caraher testified that petitioner did not meet his sales goals and was counseled regarding underperformance. Caraher further testified that all sales engineers were over 40 years old, and in September 2010, some of the sales engineers were converted to commission-only compensation due to respondent's poor financial outlook. This change did not immediately apply to petitioner, and it was only several months later that petitioner's compensation changed. Thus, petitioner cannot show that he was treated less favorably than the other sales engineers. Moreover, petitioner has failed to show that this change in compensation was pretextual when respondent was struggling financially, converted other sales engineers to commission-only compensation, laid off employees, and eventually ceased operations.

¶ 47    We also note that petitioner provided no evidentiary support for his claims regarding his sales not being approved and that respondent assessed improper costs against his projects, nor did he identify specific accounts or younger colleagues whose projects were not improperly charged.

Additionally, as the Commission observed, it would "def[y] logic" to suggest respondent, a company in financial distress, would reject profitable projects out of animus.

¶ 48    Before this court, petitioner argues that the Commission erred by rejecting his unrebutted testimony. He relies on *Bucktown Partners v. Johnson*, 119 Ill. App. 3d 346, 353 (1983), for the proposition that "the unimpeached and uncontradicted testimony of a witness cannot be arbitrarily disregarded by a finder of fact." He concludes that because no witnesses contradicted his testimony and he was not impeached, the Commission erred by not finding for him on these issues. We disagree.

¶ 49    Although plaintiff testified that costs were charged against his accounts and his proposed sales were rejected, Caraher testified that no one in the estimating department had the authority to reject a "profitable project," he was not aware of costs from other jobs being charged against petitioner's projects, and he addressed costs being moved or other unethical issues once he was made aware of them. Thus, although petitioner's testimony was not impeached, respondent presented evidence to rebut his testimony and petitioner presented no evidence to corroborate his testimony, such as account statements or other documents. The credibility of witnesses and the weight to be accorded their testimony are considerations for the trier of fact. *Sweilem v. Illinois Department of Revenue*, 372 Ill. App. 3d 475, 485-86 (2007). Here, the Commission considered the evidence and the testimony and was unable to conclude that respondent rejected petitioner's proposed sales or improperly altered the finances for his projects. These findings of fact were not contrary to the manifest weight of the evidence, since the opposite conclusion, *i.e.*, that a company in financial difficulty would reject profitable sales and engage in accounting irregularities just to encourage an employee to quit, was not clearly evident.

¶ 50    Plaintiff next contends that the Commission erred when it found that his removal from the Pepper Construction account, his change in compensation, the rejection of his proposed projects, and the improper charges against his projects did not amount to a pattern of discriminatory behavior leading to constructive discharge.

¶ 51    "A constructive discharge occurs when an employee's working conditions are made so intolerable that the employee, acting as a reasonable person, is compelled to resign." *Stone v. Department of Human Rights*, 299 Ill. App. 3d 306, 316 (1998); see also *Raintree Health Care Center v. Human Rights Comm'n*, 275 Ill. App. 3d 387, 395 (1995), *aff'd* 173 Ill. 2d 469 (1996) ("Constructive discharge occurs when the employer alters the working conditions of an employee to the point where the employee had effectively been fired and compelled to leave."). Thus, the question is how a reasonable person would react to the employee's situation. *Stone*, 299 Ill. App. 3d at 316.

¶ 52    In the case at bar, petitioner was converted to commission-only compensation, and would not earn money if his projects were not approved. He testified that because he was not earning money he had been terminated, and therefore, he stopped going to the office and began looking for a new job. Caraher, however, testified that respondent wanted to retain petitioner, albeit it under different terms, namely, commission-only compensation. The Commission concluded that even if the change in compensation would have led a reasonable person in petitioner's position to resign, petitioner failed to establish that the change in compensation was due to his age. The Commission noted that while petitioner was removed from one account due to the client's age bias, petitioner's evidence did not establish that his projects were rejected or that his compensation was changed for the same reason. In other words, the Commission was not persuaded that every other adverse

employment action was related to the reasons for petitioner's removal from the Pepper Construction Division 32 account. With the change to commission specifically, the evidence was that respondent was under financial pressure and wanted its business relationship with petitioner to continue.

¶ 53    Contrary to petitioner's position on appeal, the Commission considered all of his allegations when analyzing whether he was constructively discharged. However, it concluded that the mere fact that one of those allegations was due to age bias did not mean that every other action also reflected age bias when no evidence supported that conclusion.

¶ 54    Petitioner finally contends that the Commission "severely" miscalculated his damages because it failed to consider the damages caused by the "cooking of the books," his projects being rejected, the change in compensation to commission only, and his constructive discharge. He also contends that the Commission's finding on attorney fees, which awarded an amount based on partial success, was in error because had the "proper analysis been done," he would have prevailed on all his claims and his attorneys would have been awarded the full amount.

¶ 55    "The amount of damages awarded to a prevailing complainant under the Human Rights Act must be affirmed on review absent an abuse of discretion." *City of Chicago v. Human Rights Comm'n*, 264 Ill. App. 3d 982, 987 (1994). Here, having found no error in the Commission's findings as to petitioner's claims, we find no abuse of discretion in the amount of damages awarded.

¶ 56    Accordingly, we affirm the Commission's finding that petitioner failed to establish a *prima facie* case of age discrimination for the adverse employment actions at issue in this appeal, that

respondent articulated legitimate, non-discriminatory reasons for those actions, and that respondent's proffered reasons for its actions were not pretextual.

¶ 57    Affirmed.